616 P.2d 422

**FOUR HILLS COUNTRY CLUB,**
Appellant,

v.

**BERNALILLO COUNTY PROPERTY
TAX PROTEST BOARD, Appellee.**

No. 3899.

Court of Appeals of New Mexico.

Oct. 30, 1979.

Rehearing Denied Nov. 13, 1979.

Writ of Certiorari Quashed July 29, 1980.

George A. Dubois, Frank A. Dickson, Albuquerque, for appellant.

Pedro G. Rael, Kenneth A. Hunt, Albuquerque, for appellee.

## OPINION

WALTERS, Judge.

Following a protest hearing requested by the taxpayer, the Bernalillo County Valuation Protests Board (Board) upheld the county assessor's valuation of 156 acres owned by and operated as the Four Hills Country Club (Four Hills), and the tax assessed against it. Four Hills appeals, contending arbitrary, capricious, and erroneous valuation because the comparable sales data accepted by the Board lacked proper foundation and because the Board ignored the 10% limitation on annual tax increases mandated by § 7–36–17, N.M.S.A. 1978. We reverse.

In 1977 the parties stipulated that the taxable value of the property in 1975, 1976 and 1977 was $633,064. The contention of Four Hills made at the hearing and now in this court that the property had a zero value because of the restrictions and servitudes on it and the club's enhancement of surrounding properties cannot be considered. We do not disagree with such a finding made by the Washington Supreme Court in *Twin Lakes Golf and Country Club v. King County*, 87 Wash.2d 1, 548 P.2d 538 (1976), and similar decisions in Oregon and Michigan, but here the parties agreed there was substantial value to the property for the three years prior to 1978. There having been no showing below of a change in restrictions and servitudes between the date of stipulation and the 1978 assessment, Four Hills may not now retract its agreement and argue no value at all. *Cf. Freedman v. Perea*, 85 N.M. 745, 517 P.2d 67 (1973) (binding effect of stipulation). The truth of the facts contained in the stipulation cannot be contradicted by either party to it. *Palmer v. City of Long Beach*, 33 Cal.2d 134, 199 P.2d 952 (1948).

The Assessor did a "cost replacement" appraisal of the property in 1975 for the 1976 taxable year, and that figure of $1,403,283 was used as the assessed value for the 1978 tax notice. The million–plus valuation, however, was the contested figure from which arose the stipulation referred to above. Nevertheless, the 1975 appraisal was resurrected when a new appraiser was assigned to appraise the property for 1978 taxes, and upon that 1975 appraisal figure, the 1978 tax valuation notices were mailed to Four Hills. After Four Hills protested and before the hearing was held, the appraiser was instructed to make a comparable sales evaluation to justify the 1975 appraisal made by the cost replacement method. This was done to satisfy the obligation of § 7–36–15. N.M. S.A. 1978 [then § 72–29–5, N.M.S.A. 1953 (1975 Supp.)], which permits appraisal by the income or cost methods of appraisal only if there is a lack of data upon which to make an evaluation determined by the sales of comparable properties.

Our review, then, is focused upon the acceptability of the evidence of comparable sales and the Board's conclusion of valuation based upon those comparables.

Four Hills requested 107 findings of fact, almost all of which challenged in detail the properties submitted as comparables, and the methods used in arriving at an evaluation of Four Hills as related to the asserted values of those properties. The protestant's requested findings minutely described the dissimilarities between the comparables and the property being appraised, and specified the alleged errors of the appraiser in his adjustment techniques, his use of unverified data, and his incomplete information concerning those comparable sales. The Board's "Order" approving the 1978 valuation, on the other hand, contained ten numbered paragraphs, five of which dealt with the description of the property, its improvements, the stipulated value for 1975, 1976 and 1977, and the amount in dispute by reason of the 1978 valuation. The remainder of the Board's Order was as follows:

6. That there is no dispute as to the method of valuation for the subject prop-

erty, and that the value of the subject property for property taxation purposes as of January 1, 1978, and for the tax year *1978*, is its market value as determined by sales of comparable property; that there is not a lack of comparable sales data for protestant's property; and that similar properties to the property which is the subject of his protest are properties which contain golf courses with country club facilities upon them.

7. That the method of valuation by which market value is determined by sales of comparable property is a process of analyzing sales of similar recently sold properties in order to derive an indication of the most probable sales price of the property.

8. That the protestant and the assessor presented to the board evidence of an analysis of sales of recently sold properties similar to the protestant's property, as follows:

| Assessor | Protestant |
| --- | --- |
| St. Andrews Golf Club, Overland Park, Kansas | Rio Rancho Golf and Country Club, Rio Rancho, New Mexico |
| Blue Springs Country Club Blue Springs, Missouri | Ranchland Hills Golf Course and Country Club Midland, Texas |
| Tomahawk Hills Golf Course Overland, Kansas | |
| Cree Meadows Golf Course Ruidoso, New Mexico | |
| Rio Rancho Golf and Country Club Rio Rancho, New Mexico | |
| Albuquerque Sunport Albuquerque, New Mexico | |
| Cloudcroft Country Club Cloudcroft, New Mexico | |

9. That based on the evidence presented the assessor contended that the value of the property which is the subject of this protest for the *1978* tax year is a range of value from $1,382,376.00 to $1,957,166.00, that the assessor's final conclusion about the value is $1,600,000.00; that based on the evidence presented the protestant contended that the value of the property for the 1978 tax year is –$0–.

10. That the most probable sales price of the property of the protestant as of January 1, 1978 is $1,382,376.00.

IT IS THEREFORE ORDERED that no change be made in the valuation records of the Bernalillo County Assessor, and that the Bernalillo County Assessor take appropriate action to carry out this order.

Four Hills Country Club obtained its deed from the developer of the Four Hills area for no consideration, but with a permanent restriction that the 156 acres comprising the golf course could never be used for any other purpose. The county's appraiser was unaware of any such use limitation and did not take that fact into consideration when he adopted the 1975 cost replacement valuation and later attempted to justify it by the comparable sales method.

Section 7–36–15(D), N.M.S.A. 1978, requires the Tax Department of the State of New Mexico to promulgate and adopt regulations to implement the methods of valuation required to be used by county assessors. It has done so, and PTD Regulation 29–5:8, in effect at the time of the hearing, provided:

The market data approach to valuation is a process of analyzing sales of similar recently sold properties in order to derive an indication of the most probable sales price of the property being appraised. The reliability of this technique is dependent upon: (a) the availability of comparable sales data, (b) the verification of the sales data, (c) the degree of comparability or extent of adjustment necessary for differences in time of sale and time of appraisal, and (d) the absence of non-typical conditions affecting the sales price.

Keeping in mind the sparse "findings" made by the Board as we have quoted above, and the admonition of *First Nat'l Bank v. Bernalillo County Valuation Protest Bd.*, 90 N.M. 110, 115, 560 P.2d 174, 179 (Ct.App.1977) that an administrative body "must, at least, indicate the reasoning of the board and the basis on which it acted," we perceive the Board's order to rest upon its determination that comparable sales data were not lacking, that golf courses with country club facilities were similar properties, and that evidence of prices such

properties sold for sustained the assessor's conclusion of value for purposes of taxing Four Hills.

We think an analysis of the data relied on by the appraiser, together with the data developed by the protestant and presented at the hearing, and applying the test of reliability established by PTD Regulation 29–5:8, sufficiently destroys the basis of the County's appraisal to require reversal. We summarize some of that evidence:

*St. Andrews Golf Club, $1,077,200 sales price:*

(a) Of the 271 acres purchased, 120 acres were available for recreational, residential or commercial development, and the value of the 120 acres was not subtracted from the total value.

(b) The land was purchased by a local government using federal funds for one–half the cost of purchase, but the appraiser did not know that;

(c) The county's appraiser used another appraiser's analysis and information concerning the sale, and did not verify any of the information contained in that report;

(d) Other factors not considered by or known to the county's appraiser:

(i) Whether the purchase was made primarily to acquire open or park space, or to regulate development under zoning laws;

(ii) Whether there were permanent restrictions on the use of the land developed as a golf course;

(iii) Whether additional acquisitions, such as water rights or a liquor license, were included in the purchase price;

(iv) That the acquisition of the golf course was incidental to the City of Overland Park in acquiring the 271–acre parcel.

*Tomahawk Hills Golf Course, $1,068,200 sales price:*

(a) All information on this 225–acre purchase was obtained from another appraiser, and not verified by the county's appraiser;

(b) The property was not looked at by the county's appraiser;

(c) The county's appraiser did not talk with anyone connected with the purchase and sale;

(d) Other factors not known to and therefore not considered by the county's appraiser:

(i) Whether the golf course carried a restricted use;

(ii) That the federal government supplied half of the funds to purchase; the county government issued bonds to cover the other half;

(iii) That the property was acquired primarily for expansion of county recreational facilities and secondarily to permanently set aside open space to prevent residential development;

(iv) That the country club's motive in selling was its financial instability.

*Cree Meadows, $320,000 sales price:*

(a) Sale of this 160–acre golf course was not an arm's length transaction;

(b) The county's appraiser testified it was not a "meaningful" comparable sale.

*Cloudcroft Country Club, $540,000 sales price:*

(a) All information on this 54–acre course was obtained from a second appraiser, and was not verified by the county's appraiser;

(b) The county's appraiser had driven by the golf course but had never inspected it, and did not pay any attention to any improvements on the property;

(c) A portion of the 54–acre plot was to be developed for residential purposes;

(d) Other factors not discovered by the county's appraiser and therefore not considered by him:

(i) That the total acreage involved in the sale was 2,200 acres, and included a ski run, a lodge, and surrounding unimproved property;

(ii) That the golf course was not a separately–priced item of sale;

(iii) That the sales price included a 7,000 square–foot club house; 12,000 square–foot tennis court, a swimming pool, and 8,640 square feet of stables;

(iv) That the golf course was acquired solely as a tool for selling adjoining undeveloped property;

(v) Whether the golf course area was restricted to golf course use only.

*Blue Springs Country Club, $750,000 sales price:*

(a) All information on this 112–acre property was obtained from the appraiser who furnished the data on St. Andrews and Tomahawk Country Clubs, was not verified by the county's appraiser, and he had no personal knowledge of any of the data;

(b) The county appraiser did not personally look at the property;

(c) The county appraiser did not know whether the property was purchased from a developer, whether the sales price reflected a developer's cost, or whether the purchasers were obliged to purchase the property under a previous development arrangement;

(d) The county appraiser did not know whether there were any use restrictions on the land;

(e) The county appraiser thought the entire golf course could be developed into a residential or resort area.

*Albuquerque Sunport, $358,000 sales price:*

(a) The county's appraiser talked to a person in the City's department for purchasing and selling real estate, but did not verify the information obtained on this 9–hole, 28–acre transaction;

(b) The protestant produced evidence that the sales price was $280,000; that the federal government paid 84.2% of the purchase price; and that the land was acquired to assure a clear zone for flight path clearance purposes;

(c) The county's appraiser did not know and therefore did not take into consideration:

(i) What appraisals had been submitted to the City or how the appraisals had been done;

(ii) Whether participation by a federal agency in the purchase price would affect the reliability of the property as a comparable sale;

(iii) What the City's purpose was in purchasing the property.

*Rio Rancho Country Club, $1,500,000 sales price:*

(a) The 200–acre total sale included 29 acres of perimeter land ideally suited for development, and a value of $500,000 was attached for those 29 acres;

(b) The county's appraiser personally inspected the property and felt its location and facilities were comparable to those of Four Hills;

(c) The purchaser had an option to receive from the seller $168,000 as an operating capital advance, plus $100,000 for construction costs, plus a 36–month payback commencing three years after sale, as well as the right to abandon the purchase at any time if the club could not be operated profitably;

(d) The county's appraiser testified that the golf course area was restricted to use as a golf course;

(e) Terms of the transaction not learned by the county's appraiser and thus not considered by him, were:

(i) A liquor license was included in the sales price;

(ii) There were no restrictions on the developable property;

(iii) The developable acreage surrounding the golf course could be sold by the purchaser; its value was estimated at approximately $1,800,000; it could be returned to the seller for a reduction in the purchase price of $500,000 if not sold or developed within four years;

(iv) The purchaser paid no money down; six percent interest only was due the first six years; if the interest could not be paid, it was added at the end of the 20–year note for the principal.

(v) 500 memberships in the club were transferred to the purchaser.

According to the testimony of the expert appraiser offered by the Assessor, the sole adjustment made by him to bring the properties above outlined into a comparable sales status was to evaluate square footage of buildings, improvements, parking areas, tennis courts and swimming pools (if any)

at values of $4 to $20 per square foot; to adjust between 9– and 18–hole courses at $15,000 per hole; and to adjust for the difference in acreage at $6,000 per acre. This was admitted to be without regard for any use restrictions or personal property included in the sales, and on a cost replacement basis "to go out and start over on [developing] a golf course . . . as an appreciated value." Without explaining the process of adjustment, the witness gave as an example a sale of 707 acres in 1973 for $3,816 per acre, "[a] portion of it is known as Taylor Ranch now, which portion of it could be very usable as a golf course, could be developed as a golf course on it. . . . Adjusting for time, location, size of the property it adjusted down to $6400 per acre."

██ This, indeed, may have been a proper adjusted, cost replacement, or market value of that land in 1978, but this court is left totally in the dark—as was the Protest Board—in fathoming how the factors of time, location and size were applied to reach the adjusted figure. It is a bare assertion of opinion without any description of how the witness arrived at that opinion. The rule is this jurisdiction has long been that experts must satisfactorily explain the steps followed in reaching a conclusion, see, e. g., City of Santa Fe v. Gonzales, 80 N.M. 401, 456 P.2d 875 (1969); City of Albuquerque v. Chapman, 76 N.M. 162, 413 P.2d 204 (1966); and without such an explanation the opinion is not competent evidence. State v. Brionez, 91 N.M. 290, 573 P.2d 224 (Ct.App. 1977). Brionez, supra, at 91 N.M. 296, 573 P.2d 224, establishes that Rule 705, N.M.R. Evid. 1978, requires the expert to "give his reasons" for his opinion.

██ We have itemized some of the facts not considered by the county's expert in reaching his conclusions on comparable sales. In our view, the expert's blanket acceptance of hearsay information on all but two properties, and his failure to consider so many influencing facts in all of the so–called "comparable sales," all but destroyed any weight that might be given to his opinions.

The Assessor argues that its witness testified that reliance on another appraiser's reports is an accepted appraisal technique; thus, there is support in the record for the Board's favorable reception of the expert's evaluation. We are not impressed with that argument. If the only purpose for calling an expert is to have him put forth the hearsay opinion of another, the trier of facts could as well obtain the material itself and dispense with hearing any witnesses. It may be "technique" acceptable among appraisers, but it is not acceptable as "comparables" evidence offered at valuation protest hearings, particularly when it is affirmatively shown that dissimilarities in the properties and the unusual circumstances of some of the sales were considered neither by the original appraiser nor the witness relying on his reports. See First Nat'l Bank v. Bernalillo Co. Valuation Bd., 90 N.M. 110, 114–15, 560 P.2d 174 (Ct.App. 1977); Peterson Properties, Del Rio Plaza Shopping Center v. Valencia County Valuation Protests Bd., 89 N.M. 239, 243–44, 549 P.2d 1074, 1079–78 (Ct.App.1976); and Petition of Kinscherff, 89 N.M. 669, 673, 556 P.2d 355, 359 (Ct.App.1976), for discussions of matters to be taken into account in analyzing comparable sales and fair market values.

We are also of the opinion that Regulation § 29–5:8 of the Property Taxation Board was ignored in every respect: the sales data was only cursorily verified in some cases, not verified at all in others; the degree of adjustment necessary in every instance but one was considerable rather than nominal; and nontypical conditions of sale prevailed in every "comparable sale" presented.

We hold the evidence produced at the hearing below to have been insufficient to support the order of the Board (§ 7–38–28, N.M.S.A. 1978); we further hold the Board's order to be so devoid of reasoned findings as to violate the guidelines emphasized by Judges Sutin and Hernandez in First National Bank, supra, at pages 90 N.M. 115–117, 560 P.2d at 179–181.

 Upon rehearing of this matter, we direct the Board's attention to the language

of *Petition of Kinscherff, supra,* at 89 N.M. 673, 556 P.2d 359:

> What the fair market value of a tract may have been in the past or speculation as to what it might be in the future cannot serve as the basis for valuation. . . . [T]he statute . . . mandates determination of value on January 1 of the year in question.

We cite those words of caution because the redetermination of value for 1978 must also be made with the provisions of § 7–36–17, N.M.S.A. 1978, in mind, limiting any increased valuation for taxation purposes to 10% of the previous property tax year. Thus, any increase in the 1978 valuation may not exceed 10% of the stipulated 1977 taxation value.

█ Our direction on this issue answers appellee's contention that the "10% rule" is unconstitutional. The county filed no cross–appeal on that question and it was therefore improper to raise it in its Answer Brief. An additional impropriety in doing so is expressed by our Supreme Court in *State ex rel. State Highway Comm'n v. Hesselden Inv. Co.,* 84 N.M. 424, 504 P.2d 734 (1973).

We wish to make two further comments regarding transcript problems that continually plague this court.

We have no illusions why court reporters type "forty–one dollars and twenty–six cents" rather than "$41.26," or "thirty–one thousand, five hundred and forty square feet" instead of "31,540 square feet." It is not to avoid error in transcription, or to aid the reader in finding numbers or amounts amid the overflow of words in a transcript—it is solely to extend the lines of the page, since § 34–6–20, N.M.S.A. 1978, provides for payment by the page for typewritten transcripts. It is for the same reason that a partial last line or two of a page is frequently erased: The statute requires a page to be *not less* than twenty–five lines. Many court reporters steadfastly have read the provision to mean *not more* than twenty–five lines. Thus we contend with longer, bulkier and more unwieldy transcripts daily.

An even more vexing situation exists, however. As in almost all appeals from administrative agency hearings, the agency is required to have a transcript prepared, and the protestant is required to pay for the requisite number of copies to be filed, plus an additional copy for the agency. In this case, as in an increasing number of tax appeals filed in this court, we are asked to review bulky transcripts and multitudinous exhibits, rarely adequately indexed. The instant appeal contained 295 pages of transcript. Not a single reference appears in the index to the location of examination or cross–examination of any witness, or to the location of pleadings or argument included in that transcript. Two hundred twenty–seven numbered pages of exhibits were forwarded in two separate volumes and were indexed to show only at what page of the transcript each was received or denied. In the exhibits volumes, however, we are advised of the location of exhibits in this fashion:

| | |
|---|---|
| Board's Exhibit Nos. 1–5 | 293 thru 323 |
| Protestant's Exhibit Nos. 1–3 | 324 thru 518 |
| Protestant's Exhibit Nos. 4–12 | 519 thru 594 |
| County Exhibit Nos. 1 & 2 | 595 thru 596 |
| Board's Exhibit Nos. 3 & 4 | 597 thru 615 |

The frustrating and time–consuming burden of thumbing through 196 pages in order to find the end of one exhibit and the beginning of another and with no identification of the nature of any numbered exhibit; of doing the same with 295 pages of testimony to locate a specific witness's testimony; or of preparing one's own index to avoid such aggravation, is inexcusable. Yet this transcript reflects the usual form, rather than the exception, in which administrative appeals reach us.

If transcript and record preparations continue in this manner, we are prepared to do whatever is necessary to remedy the problem, even to assessing fines for inadequate indexing against the agency or the court reporter, or both.

This case is reversed and remanded for rehearing in accordance with the views we have expressed.

IT IS SO ORDERED.

HENDLEY and LOPEZ, JJ., concur.