1999-NMSC-007

974 P.2d 140

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Barry Lee FOSTER, Defendant–Appellant.**

**No. 24240.**

Supreme Court of New Mexico.

Jan. 20, 1999.

Wade Russell, Santa Fe, for Appellant.

Hon. Tom Udall, Attorney General, Ralph E. Trujillo, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

MINZNER, Chief Justice.

{1} Defendant appeals his convictions for first degree felony murder, second degree murder, aggravated kidnapping, armed robbery, unlawful taking of a vehicle, and resisting, evading, or obstructing an officer. On appeal, Defendant claims that (1) the district court violated his constitutional right to be free from double jeopardy by convicting and sentencing him for first degree felony murder, second degree murder, aggravated kidnapping, and armed robbery; (2) the evidence presented at trial was insufficient to support his conviction for first degree felony murder because the testimony of the State's fingerprint experts did not include a point-

by-point comparison between Defendant's palm print and the palm print found on the murder weapon; (3) the district court violated Defendant's constitutional right to due process and a fair trial by allowing the State's fingerprint expert to testify without sufficient notice for the defense to prepare for cross-examination; (4) the district court abused its discretion in admitting evidence of a prior act of Defendant under Rule 11–404(B) NMRA 1998; (5) the charge of first degree felony murder should have been dismissed before the second trial because the district court failed to instruct or poll the jury on lesser included offenses before declaring a mistrial on all charges; (6) all charges should have been dismissed prior to the second trial because the State violated the six-month time limit expressed in Rule 5–604 NMRA 1998; and (7) Defendant was denied a fair trial because of cumulative error.

{2}   The jury instructions in this case provided alternative bases for convicting Defendant of first degree felony murder, aggravated kidnapping, and armed robbery. The jury returned general verdicts that do not indicate which of these alternatives the jurors relied upon to find Defendant guilty. Under these circumstances, we must reverse a conviction if one of the alternative bases for the conviction provided in the jury instructions is legally inadequate because it violates a defendant's constitutional right to be free from double jeopardy. Applying this principle, we reverse Defendant's conviction for armed robbery on double jeopardy grounds. We also reverse Defendant's conviction for second-degree murder as the State concedes on appeal that Defendant cannot be convicted for both first degree murder and second degree murder when there is only one murder victim. Finding no merit to Defendant's other claims, we affirm his convictions for first degree felony murder, aggravated kidnapping, unlawful taking of a vehicle, and resisting, evading, or obstructing an officer.

## I.   BACKGROUND

{3}   On the morning of January 14, 1994, the body of a woman was discovered in her home four blocks south of the University of New Mexico Arena in Albuquerque. The contents of her purse had been dumped out on her bed, and her car was missing from her driveway. There were no signs of a forced entry.

{4}   A neighbor had observed the victim arrive home between 4:00 and 5:00 p.m. on January 13, 1994, and the victim's car was parked in her driveway that evening. According to the victim's relatives, it was routine for someone to drive her to work in her car in the morning, then drive it back to her home and park it in her driveway. She would not loan her car to anyone overnight. On the morning of January 14, however, no one came to drive the victim to work because she had a doctor's appointment that day.

{5}   According to her relatives, the victim was 56 or 57 years old and lived alone. She had iron security bars on her windows and doors. Several witnesses testified that she kept her doors locked and would not open them to strangers. Defendant, however, was not a stranger. He was the victim's nephew, and his father's house was only three houses away from the victim's house.

{6}   On January 13, 1994, Defendant was an inmate at a correctional facility in Los Lunas, New Mexico. That evening, he went on an escorted furlough to attend a basketball game at the University of New Mexico Arena in Albuquerque. Defendant was transported to the game with other inmates in a prison van and was allowed to wear civilian clothes. About three minutes after the second half of the game started, Defendant requested permission to go to the restroom. Defendant had not returned from the restroom when the game ended at 9:15 p.m. When he did not return to the prison van after the game, he was placed on escape status.

{7}   On the same evening as the basketball game, two witnesses saw Defendant in the neighborhood where the victim's home is located. This neighborhood is within walking distance of the basketball arena. One witness testified that she first saw Defendant at her brother's house. At that time, Defendant was wearing a white t-shirt that said "Sox" and had cartoon characters of a bunny and a coyote on it. According to the witness,

Defendant was "acting normal" when she saw him at her brother's house, and he told her that he was supposed to be in prison. Later that evening, the witness saw the prison van passing through the neighborhood, and someone in the van told her they were looking for Defendant.

{8} About an hour after she had seen Defendant at her brother's house, the witness saw Defendant again while standing on a corner in the same neighborhood. The witness could no longer see if Defendant was wearing the same t-shirt because he wore a fastened jacket. She testified that she told Defendant the prison van was looking for him, and that "he said he wasn't going to go back." According to the witness, Defendant was acting "panicky, like nervous"; he said he was scared and kept looking back down the street in the direction of the victim's house.

{9} Another witness also was present on the street corner when this conversation took place. She testified that the conversation occurred around 10:00 p.m., and she confirmed that Defendant was "jittery" at that time; he was "moving back and forth" and "kept looking back up the street." After the conversation on the street corner, Defendant walked down the street away from the witnesses.

{10} Later that night, at approximately 11:30 p.m., Officer Augustine Sena attempted to make a routine traffic stop after observing a car travel through a four-way stop without stopping. The car he was pursuing made an abrupt turn into an alleyway and crashed into a fence. Officer Sena called for backup and turned on his spotlight and high beams which illuminated the interior of the car. He observed three occupants: a female in the back seat, a male in the front passenger seat, and a tall, black male driver who climbed out the passenger door and "took off running." From the car's license plate, Officer Sena determined that it belonged to the victim. After efforts to contact the victim at her home were unsuccessful, Officer Sena had her car towed at 1:20 a.m.

{11} Officer Sena did not pursue the driver. The passengers, who remained in the car, were identified as Kenneth Ward and Louann Ortega. Although Ward gave a statement to police, he later claimed that he could not remember the incident or who the driver was. Ortega recalled that the driver was a black male who had given her a ride to purchase liquor, but claimed she did not see his face or know his name.

{12} On the morning of January 14, 1994, the victim's son went with a friend to the victim's house after receiving a call that she had missed her doctor's appointment. Her car was not in the driveway when they arrived, and the wrought-iron door on the house was open. After entering the house, they looked through the doorway to the den and saw the victim's body lying in a pool of blood. They also discovered that the contents of her purse had been dumped out in the bedroom. The victim's son became upset; he threw down his glasses and a phone book but did not touch the body. His friend called 911 and summoned the police.

{13} Officer Wade Aubuchon was dispatched to the scene at 11:39 a.m. He saw the two men flagging him down outside the victim's house. They were upset, and Officer Aubuchon instructed them to wait outside on the sidewalk by their car. Officer Aubuchon proceeded into the house and observed a woman lying on the floor, face down on her stomach, with her legs bent up at a ninety-degree angle. An electrical cord was wrapped around her ankles, leading toward her shoulders and neck. A bloody towel covered her head and shoulders. In the room where the body was found, he saw various items scattered on the floor, including a glass ashtray with blood on it. In addition, the bedroom appeared as if it had been ransacked. After paramedics arrived and determined that the victim was dead, Officer Aubuchon secured the area around her house.

{14} Frank Ciaccio, a senior deputy medical investigator, arrived at the scene to examine the victim's body. He also observed the victim in the den on her stomach with a towel over her head and an electrical extension cord tied around her neck and ankles. The extension cord had blood stains on it. It appeared that there had been a struggle.

There was a broken ashtray in front of the body, a bloody shirt on the couch, and the victim's slippers and dentures were scattered on the floor. While examining the body at the scene, he noted a contusion around the victim's eye, several lacerations on her head, and a ligature mark on her neck.

{15} The victim's body was transported to the Office of the Medical Investigator, where the State's chief medical investigator, Dr. Ross Zumwalt, performed the autopsy on January 15, 1994. Dr. Zumwalt opined that the death was a homicide, and that the cause of death was ligature strangulation, with head injuries as a contributing factor. He estimated that the victim died more than twenty-four hours before the autopsy was performed, and testified that it was possible that she died two days earlier on the evening of January 13.

{16} Dr. Zumwalt also testified that the victim had deep lacerations on her head. These lacerations indicated that the victim had been hit on the head by a hard object with an angulated edge, such as a heavy glass dish or ashtray. The lacerations were consistent with someone swinging the object at the victim's head while she was standing or sitting. According to Dr. Zumwalt, the blows to the head that caused the lacerations also could have rendered the victim unconscious. Dr. Zumwalt observed bruises on the victim's body that were consistent with the victim falling down or being pushed from behind onto the floor.

{17} The victim also had two broken ribs, and Dr. Zumwalt opined that her ribs could have been broken by someone standing or applying force on her back while she was laying on her stomach. Finally, the victim had a ligature mark that extended all the way around her neck and corresponded to an electrical extension cord that was looped around her neck and tied to her ankles. According to Dr. Zumwalt, the bruising that caused the ligature mark was consistent with the victim being alive at the time the extension cord was tightened around her neck.

{18} Dr. Zumwalt opined that the head injuries probably occurred first, and then the other injuries followed when the victim was tied up and strangled. He testified that if the victim was rendered unconscious by the head injuries and had difficulty breathing due to her age or a physical condition such as broken ribs, then she would be unable to untie herself, and the weight and position of her ankles would keep enough pressure on the extension cord to strangle her to death. He further testified that it would take several minutes for the strangulation to kill her.

{19} Officer Greg Hagel of the Albuquerque Police Department also examined the physical evidence found in the victim's home on the morning of January 14, 1994. He observed a heavy, faceted crystal ashtray with blood on it in the room where the victim's body was found. He also observed blood on the sole of one of the victim's slippers, indicating that the victim had stepped in blood before being killed. A large blood stain appeared to lead across the room from a doorway, and it appeared that someone had attempted to wipe it up or pull something through it. Officer Hagel found a crumpled t-shirt on the couch next to the victim's body, and it appeared that someone had used the t-shirt to wipe something. Another witness later identified this t-shirt as the same "Sox" t-shirt with cartoon characters on it that she had seen Defendant wearing on the evening of January 13.

{20} After Dr. Zumwalt had finished examining the victim's body, Officer Hagel examined the extension cord that was tied around the victim's neck and ankles to determine if it contained any fingerprints. He located a partial palm print on the blood-stained surface of the female end of the extension cord. Although he described it as "difficult" and "fragile," Officer Hagel was able to positively identify the print on the extension cord as Defendant's palm print. In response to the question of why Defendant's fingerprints were not found elsewhere in the house, Officer Hagel stated that Defendant could have worn gloves, but it might have been necessary to remove one of the gloves in order to tie the extension cord. Officer Hagel later found a pair of gloves in the victim's car.

{21} The palm print found on the extension cord also was analyzed by at least three

other fingerprint experts. One of these experts, a nationally known consultant who conducted an independent analysis and testified for the State, also identified the palm print on the extension cord as Defendant's. Two other experts, however, testified that they reached inconclusive results.

{22} Defendant was not arrested until March 20, 1994, when he was captured while fleeing from police. At the time of his arrest, Defendant stated that he had been living in the old Albuquerque High School building since his escape. After this Court granted several extensions of time, Defendant was tried on one count of first degree felony murder in violation of NMSA 1978, § 30–2–1(A)(2) (1994), one count of second degree murder in violation of NMSA 1978, § 30–2–1(B) (1994), one count of unlawful taking of a vehicle in violation of NMSA 1978, § 66–3–504 (1978, prior to 1998 amendment), and one count of resisting, evading, or obstructing an officer in violation of NMSA 1978, § 30–22–1 (1981). After the first trial resulted in a mistrial, the State entered a nolle prosequi and re-indicted Defendant. In addition to the charges at issue in the first trial, the second indictment included one count of aggravated kidnapping in violation of NMSA 1978, § 30–4–1 (1973, prior to 1995 amendment), and one count of armed robbery in violation of NMSA 1978, § 30–16–2 (1973). At Defendant's second trial, the jury returned guilty verdicts on the charges of first degree felony murder, second degree murder, aggravated kidnapping, armed robbery, unlawful taking of a vehicle, and resisting, evading, or obstructing an officer. The district court sentenced Defendant to life imprisonment plus twenty-nine-and-one-half years less one day. This appeal followed.

## II. DOUBLE JEOPARDY

{23} At his sentencing hearing, Defendant asserted that the district court could not convict and sentence him for first degree felony murder, second degree murder, aggravated kidnapping, and armed robbery without violating his constitutional right to be free from double jeopardy. The State disagreed with this assertion. The district court convicted and sentenced Defendant for all of these offenses.

{24} Consistent with his position at the sentencing hearing, Defendant contends on appeal that the district court's ruling violates the Double Jeopardy Clause in the Fifth Amendment to the United States Constitution because it constitutes multiple punishment for the same offense. Applying the two-part test this Court has adopted for determining whether multiple punishments violate the Double Jeopardy Clause, *see Swafford v. State*, 112 N.M. 3, 13–15, 810 P.2d 1223, 1233–35 (1991), Defendant asserts that the conduct underlying all of the offenses is unitary, and the elements of the lesser offenses of second degree murder, aggravated kidnapping, and armed robbery are subsumed within the elements of first degree felony murder.

{25} The State concedes for the first time on appeal that Defendant's conviction for second degree murder must be reversed because it violates the prohibition on multiple punishments contained in the Double Jeopardy Clause. Although we are not bound by the State's concession, *see State v. Maes*, 100 N.M. 78, 80–81, 665 P.2d 1169, 1171–72 (Ct.App.1983), we agree that Defendant's second degree murder conviction must be reversed. Since there was only one murder victim, the conduct underlying Defendant's murder convictions is unitary. *See State v. Cooper*, 1997–NMSC–058, ¶ 53, 124 N.M. 277, 949 P.2d 660. Further, the elements of second-degree murder are subsumed within the elements of first degree felony murder. *Compare* § 30–2–1(A)(2) (stating elements of first degree felony murder), *with* § 30–2–1(B) (stating elements of second-degree murder). Under these circumstances, "the inquiry is over and the statutes are the same for double jeopardy purposes—punishment cannot be had for both." *Swafford*, 112 N.M. at 14, 810 P.2d at 1234.

{26} With regard to Defendant's convictions for aggravated kidnapping and armed robbery, however, the State contends that there is no violation of the Double Jeopardy Clause because the conduct underlying these offenses and the murder is not unitary. In

particular, the State argues that the conduct required for aggravated kidnapping is not unitary because Defendant could have committed this crime by gaining entry to the victim's house through deception, *see State v. Ortega*, 112 N.M. 554, 571, 817 P.2d 1196, 1213 (1991), and the conduct required for armed robbery is not unitary because the items stolen from the victim were not located in the same room where she was killed, *cf. State v. Kersey*, 120 N.M. 517, 523, 903 P.2d 828, 834 (1995) (reasoning that there is no double jeopardy violation if the underlying felony "was sufficiently separated in time and space from the murder to establish two distinct crimes"). These arguments rely on the assumption that, when the jury instructions provide alternative bases for a conviction and there is no indication of which alternative the jury relied upon in reaching a general verdict, we may affirm the conviction if at least one of the alternatives does not violate the Double Jeopardy Clause.

{27}  We do not agree with this assumption. Although "due process does not require a general verdict of guilt to be set aside so long as *one of the two* alternative bases for conviction is supported by substantial evidence," *State v. Salazar*, 1997–NMSC–044, ¶ 43, 123 N.M. 778, 945 P.2d 996, the Double Jeopardy Clause does require a conviction under a general verdict to be reversed if one of the alternative bases for conviction provided in the jury instructions is "legally inadequate" because it violates a defendant's constitutional right to be free from double jeopardy, *see State v. Olguin*, 120 N.M. 740, 741, 906 P.2d 731, 732 (1995); *State v. Crain*, 1997–NMCA–101, ¶ 22, 124 N.M. 84, 946 P.2d 1095.

{28}  "The question of whether convictions under several statutes constitute the same offense for double jeopardy purposes is a matter of determining the legislative intent." *State v. Gonzales*, 113 N.M.

221, 224, 824 P.2d 1023, 1026 (1992). Determining legislative intent "is an issue of law, not a question of fact." *State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995). " 'Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law . . . .' " *State v. Olguin*, 118 N.M. 91, 98, 879 P.2d 92, 99 (Ct.App.1994) (quoting *Griffin v. United States*, 502 U.S. 46, 59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)), *aff'd in part, set aside in part*, 120 N.M. at 741, 906 P.2d at 732. Thus, we cannot assume that jurors will know to avoid an alternative basis for reaching a guilty verdict that would result in a violation of the Double Jeopardy Clause. *See id.* On the contrary, we must presume that a conviction under a general verdict requires reversal if the jury is instructed on an alternative basis for the conviction that would result in double jeopardy, and the record does not disclose whether the jury relied on this legally inadequate alternative. *See Crain*, 1997–NMCA–101, ¶ 22, 124 N.M. 84, 946 P.2d 1095. We apply these principles to our analysis of whether unitary conduct underlies Defendant's convictions for aggravated kidnapping, armed robbery, and first degree felony murder.

**A.  Aggravated Kidnapping**

{29}  Defendant was convicted of aggravated kidnapping in violation of Sections 30–41(A) and (B). At trial, the jury was instructed on the essential elements of aggravated kidnapping in accordance with UJI 14–404 NMRA 1996 (withdrawn 1997).[1] These elements are:

1. [D]efendant took, restrained and/or confined [the victim] by force and/or deception;

2. [D]efendant intended to hold [the victim] for service against her will;

3. [D]efendant inflicted great bodily harm on [the victim];

---

1.  Under the 1995 amendment to Section 30–4–1, kidnapping was redefined to include "the unlawful taking, restraining, transporting, or confining of a person, by force, intimidation, or deception, with intent . . . to inflict death, physical injury or a sexual offense on the victim." 1995 N.M. Laws ch. 84, § 1. Following this amendment, UJI 14–404 was withdrawn and a new set of Uniform

Jury Instructions for kidnapping was substituted in its place. *See* UJI 14–403, 14–6018 NMRA 1998. Since Defendant was charged and convicted under the statute and jury instructions in effect prior to 1995, we do not consider the effect, if any, of these changes to the kidnapping law.

4. This happened in New Mexico on or about the 13th or 14th days of January, 1994.

This instruction gave the jury several alternatives for reaching a guilty verdict on the charge of aggravated kidnapping. In particular, the kidnapping could have been accomplished by force, deception, or a combination of the two. The record does not indicate which alternative the jury relied upon in reaching its general verdict finding Defendant guilty of aggravated kidnapping.

{30} Defendant contends that his aggravated kidnapping conviction and his first degree felony murder conviction involve "unitary conduct" because the jury instruction allowed the jury to find that the victim was held for service "by force," and, under this alternative, the force used to hold the victim for service merges with the force used to kill her. Although we presume the jury found that the victim was held for service "by force" under these circumstances, see Olguin, 120 N.M. at 741, 906 P.2d at 732; Crain, 1997–NMCA–101, ¶ 22, 124 N.M. 84, 946 P.2d 1095, we do not agree with Defendant that the force used to hold the victim for service merges with the force used to kill her.

{31} The State presented evidence that Defendant held the victim in order to rob her. The State's analysis of the physical evidence also showed that the victim was cut and knocked unconscious with a glass ashtray during a struggle, and then she was strangled to death over the course of several minutes by an electrical extension cord that was tied around her neck and ankles while she lay unconscious. Under these circumstances, there are sufficient "indicia of distinctness" to separate the force used to kidnap the victim and the force used to kill her. See Cooper, 1997–NMSC–058, ¶ 59, 124 N.M. 277, 949 P.2d 660 ("The 'indicia of distinctness' include the separation between the illegal acts by either time or physical distance, 'the quality and nature' of the individual acts, and the objectives and results of each act." (quoting Swafford, 112 N.M. at 13–14, 810 P.2d at 1233–34)).

{32} As used in Section 30–4–1(A) of our kidnapping statute, the phrase "hold for service" includes forcing or deceiving a victim into assisting the kidnapper in carrying out the objective of robbery. See State v. Vernon, 116 N.M. 737, 740, 867 P.2d 407, 410 (1993). " 'Once [a] defendant [has] restrained the victim with the requisite intent to hold her for service against her will, he ha[s] committed the crime of kidnapping, although the kidnapping continue[s] throughout the course of [the] defendant's other crimes and until the time of the victim's death.' " Id. (quoting State v. McGuire, 110 N.M. 304, 309, 795 P.2d 996, 1001 (1990)). Further, "[t]he key to the restraint element in kidnapping is the point at which [the v]ictim's physical association with Defendant was no longer voluntary." State v. Pisio, 119 N.M. 252, 260, 889 P.2d 860, 868 (Ct.App. 1994).

{33} Here the jury could reasonably infer that the victim reached this point by the time Defendant hit her on the head with the glass ashtray. Based upon the definition of "great bodily harm" contained in the jury instructions, see UJI 14–131 NMRA 1998, the jury also could reasonably infer that Defendant completed the crime of aggravated kidnapping by the time he delivered the blows that caused the deep lacerations on the victim's head.

{34} We have held that the conduct required for kidnapping and murder is not unitary when the act required to commit the kidnapping was completed before the act of murder. See Kersey, 120 N.M. at 523, 903 P.2d at 834; cf. State v. Livernois, 1997–NMSC–019, ¶ 21, 123 N.M. 128, 934 P.2d 1057 (holding that aggravated burglary and first degree murder are not unitary when the burglary is completed before the act of murder). We also have found sufficient indicia of distinctness when a defendant used one weapon in his initial application of force and another weapon in a subsequent attack. See Cooper, 1997–NMSC–058, ¶ 61, 124 N.M. 277, 949 P.2d 660. Applying these principles here, we conclude that Defendant's use of the glass ashtray to complete the crime of aggravated kidnapping is distinct from his use of the extension cord to strangle the victim to death.

{35} The conduct underlying Defendant's convictions for aggravated kidnapping and first degree felony murder is not unitary. Therefore, we need not consider whether the statutory elements of aggravated kidnapping are subsumed by the elements of first degree felony murder. *See id.* ¶ 56. Based on the lack of unitary conduct, we conclude that the district court did not violate the Double Jeopardy Clause by convicting and sentencing Defendant for both first degree felony murder and aggravated kidnapping.

## B. Armed Robbery

{36} Defendant was convicted of armed robbery in violation of Section 30–16–2. At trial, the jury was given an instruction on the essential elements of armed robbery patterned on UJI 14–1621 NMRA 1998. These elements are:

1. [D]efendant took and carried away car keys and/or a 1985 Crown Victoria and/or U.S. currency which had some value to [the victim], or from her immediate control intending to permanently deprive [the victim] of the property;

2. [D]efendant was armed with a glass dish, and/or ligature, an instrument or object which, when used as a weapon, could cause death or very serious injury;

3. [D]efendant took the car keys and/or 1985 Crown Victoria and/or U.S. currency by force or violence or threatened force or violence;

4. This happened in New Mexico on or about the 13th or 14th day of January, 1994.

This instruction provided the jury with several alternative bases for a conviction: the armed robbery could have involved the taking of the victim's car, car keys, or money, by the use of force, violence, or threats of force or violence, while armed with a glass dish or a ligature. The record does not indicate which alternative the jury relied upon in reaching its general verdict finding Defendant guilty on this charge.

{37} Defendant contends that his armed robbery conviction and his first de-gree felony murder conviction involve "unitary conduct" because the jury instruction allowed the jury to find that Defendant took the victim's property "by the use of force," and, under this alternative, the force used to rob the victim merges with the force used to kill her. We agree that the conduct underlying these offenses is unitary because the jury instruction allowed jurors to convict Defendant of armed robbery based on the alternative that Defendant used force to rob the victim "while armed with ... a ligature." For purposes of our double jeopardy analysis, we presume the jury relied on this alternative because the record does not indicate otherwise. *See Olguin*, 120 N.M. at 741, 906 P.2d at 732; *Crain*, 1997–NMCA–101, ¶ 22, 124 N.M. 84, 946 P.2d 1095.

{38} Under this alternative, "[t]he deadly weapon defined the quality and nature of the armed robbery." *State v. Contreras*, 120 N.M. 486, 490, 903 P.2d 228, 232 (1995). If Defendant committed the armed robbery while armed with a ligature, then the same extension cord that served as the murder weapon also functioned as the "deadly weapon" for purposes of Defendant's armed robbery conviction. The evidence does not show that Defendant used a different ligature to rob the victim, or that he strangled her on more than one occasion.

{39} The evidence also does not show a significant separation in time or physical distance between the armed robbery and the murder. *Cf. State v. Lopez*, 1996–NMSC–036, ¶ 30, 122 N.M. 63, 920 P.2d 1017 (finding that conduct underlying attempted armed robbery and murder was unitary where the defendant entered a gas station while armed with a rifle, then shot and killed a victim standing outside a doorway). Because the jury instruction allowed the jury to find that Defendant took the victim's car, car keys, money, or a combination of these items, and the record does not indicate which alternative the jury selected, we presume for purposes of our double jeopardy analysis that Defendant's armed robbery conviction was based on his taking of the item in closest proximity to the room where the victim was murdered. *See Olguin*, 120 N.M. at 741, 906 P.2d at 732; *Crain*, 1997–NMCA–101, ¶ 22,

124 N.M. 84, 946 P.2d 1095. Applying this presumption, we conclude that the conduct underlying Defendant's armed robbery conviction and his first degree felony murder conviction is unitary, and we must turn to the second part of our inquiry to determine whether the elements of the two offenses are the same. *See Swafford,* 112 N.M. at 14, 810 P.2d at 1234.

{40} At trial, the jury was instructed that in order to find Defendant guilty of first degree felony murder, it had to find that Defendant "caused the death of [the victim] during the commission of unlawful taking of a motor vehicle and/or kidnapping resulting in great bodily harm and/or armed robbery." *See* UJI 14–202 NMRA 1998. Although the jury returned guilty verdicts on all three of these underlying felonies, the record does not indicate which ones the jury relied upon to reach its general verdict finding Defendant guilty of first degree felony murder. Under these circumstances, we presume for purposes of our double jeopardy analysis that the armed robbery provided the underlying felony for Defendant's first degree murder conviction. *See Olguin,* 120 N.M. at 741, 906 P.2d at 732; *Crain,* 1997–NMCA–101, ¶ 22, 124 N.M. 84, 946 P.2d 1095. Applying this presumption, we conclude that the elements of armed robbery are subsumed within the elements of first degree felony murder in this case. *See Contreras,* 120 N.M. at 491, 903 P.2d at 233. "[W]hen, as here, one's conduct is unitary, one cannot be convicted of and sentenced for both felony murder and the underlying felony." *Id.* Therefore, we must reverse Defendant's conviction and sentence for armed robbery.

## III. SUFFICIENCY OF THE EVIDENCE

{41} Defendant's next contention is that there is insufficient evidence to support his conviction for first degree felony murder because the testimony of the State's fingerprint experts did not include a point-by-point comparison of Defendant's palm print and the palm print found on the cord that was used as the murder weapon. According to Defendant, such a point-by-point comparison is necessary to establish the basis for a finger-print expert's opinion, and without such a comparison, the jury had to "make a leap of faith and simply accept the opinions of the experts." Since Defendant does not challenge the sufficiency of the evidence in any other regard, we limit our review to the question of whether this alleged defect in the testimony of the State's fingerprint experts renders the evidence insufficient to support Defendant's felony murder conviction. *Cf. State v. Aragon,* 109 N.M. 632, 634, 788 P.2d 932, 934 (Ct.App.1990) (issues not addressed in an appellant's brief will be deemed abandoned).

{42} In answering this question, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary. *See State v. Baca,* 1997–NMSC–059, ¶ 14, 124 N.M. 333, 950 P.2d 776. Further, "[o]ne of the most fundamental rules of American jurisprudence is that the jury has the privilege to believe or to disbelieve any testimony it hears. It is the duty of our courts, therefore, to determine initially whether expert testimony is competent under Rule [11–702 NMRA 1998], not whether the jury will defer to it." *State v. Alberico,* 116 N.M. 156, 164, 861 P.2d 192, 200 (1993) (citation and footnote omitted).

{43} The New Mexico Rules of Evidence provide various methods for testing the basis of an expert's opinion. *See* Rules 11–703, 11–705 NMRA 1998; *Jaramillo v. Fisher Controls Co.,* 102 N.M. 614, 625, 698 P.2d 887, 898 (Ct.App.1985). Under these rules, "experts must satisfactorily explain the steps followed in reaching a conclusion, and without such an explanation the opinion is not competent evidence." *Four Hills Country Club v. Bernalillo County Property Tax Protest Bd.,* 94 N.M. 709, 714, 616 P.2d 422, 427 (Ct.App.1979); *see also Harrison v. ICX, Illinois–California Express, Inc.,* 98 N.M. 247, 250, 647 P.2d 880, 883 (Ct.App.1982) (noting that if the basis for an expert's opinion appears unsatisfactory after a court requires the expert to disclose it, the expert's opinion is subject to being stricken). Unless the court requires otherwise, however, experts may state their opinions and give their

reasons without prior disclosure of underlying facts or data. *See* Rule 11–705; *Harrison*, 98 N.M. at 250, 647 P.2d at 883. Thus, when the opposing party neither objects to the lack of prior disclosure nor moves to strike the expert testimony in question, the issue is not preserved for appellate review. *See* Rule 11–103(A)(1) NMRA 1998; *cf. Sutherlin v. Fenenga*, 111 N.M. 767, 773, 810 P.2d 353, 356 (Ct.App.1991) ("If an attorney does not present evidence to support a hypothetical question, the opposing party must move to strike the answer in order to preserve the error for review.").

{44} In this case, Defendant's trial counsel did not make a timely objection to the lack of a point-by-point comparison of the palm prints at trial, nor did he move to strike the testimony of the State's fingerprint experts on this basis. Indeed, Defendant does not cite any authority for the proposition that the State's experts were not competent to testify or that their testimony was inadmissible. "Issues raised in appellate briefs which are unsupported by cited authority will not by reviewed by us on appeal." *In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984). Under these circumstances, we are in no position to intrude upon "the most basic function of a jury to arbitrate the weight and credibility of [the] expert opinion testimony." *Alberico*, 116 N.M. at 164–65, 861 P.2d at 200–01.

{45} Both of the expert witnesses who identified Defendant's palm print on the extension cord were questioned at trial regarding the basis for their opinions. In response to these questions, the experts explained their methodology, identified the physical evidence and photographic enlargements that they reviewed, noted the size and location of the print found on the extension cord in relation to Defendant's palm, and stated the number of points of comparison that they found between Defendant's palm print and the palm print found on the cord. One of the State's experts also testified that the relative position of certain "ending ridges and bifurcation" was the same on both prints, and that there was a "looping formation" found in the same corresponding area of both prints.

{46} In addition to the palm print analysis linking Defendant to the murder weapon, the State presented evidence that, on the night of the murder, Defendant was seen near the victim's house wearing a t-shirt that was later found crumpled and stained with blood next to the victim's body. When viewed in combination with the other evidence linking Defendant to the crime, the expert testimony regarding the palm print analysis was sufficient to support Defendant's conviction for first degree felony murder. *See State v. Duran*, 107 N.M. 603, 605, 762 P.2d 890, 892 (1988); *cf. State v. Mireles*, 119 N.M. 595, 597, 893 P.2d 491, 494 (Ct.App. 1995) (concluding that evidence was sufficient to support involuntary manslaughter conviction where presence of defendant's fingerprints at the crime scene was consistent with other testimony); *State v. Griffin*, 108 N.M. 55, 59, 766 P.2d 315, 319 (Ct.App.1988) (considering testimony of fingerprint expert in determining sufficiency of evidence of identity). Thus, this issue does not provide a basis for reversing Defendant's first degree felony murder conviction.

## IV. OTHER UNPRESERVED ISSUES

{47} Defendant raises several additional issues for which he did not fairly invoke a ruling by the district court. Under Rule 12–216(A) NMRA 1998, "[t]o preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked." *See also State v. Gomez*, 1997–NMSC–006, ¶ 14, 122 N.M. 777, 932 P.2d 1 (discussing origins of Rule 12–216). In this case, it is Defendant's burden to explain how the issues presented in his brief were preserved in the court below "with citations to authorities and parts of the record proper, transcript of proceedings or exhibits relied on." Rule 12–213(A)(4) NMRA 1998; *State v. Goss*, 111 N.M. 530, 533, 807 P.2d 228, 231 (Ct.App.1991). When an issue is not preserved in this manner, our review generally is limited to consideration of jurisdictional questions, issues of general public interest, or matters involving fundamental error or fundamental rights of a party. *See* Rule 12–216(B); *Gomez*, 1997–NMSC–006, ¶ 15, 122 N.M. 777, 932 P.2d 1. Further, the doctrine

of fundamental error applies only under exceptional circumstances, as when appellate review is necessary " 'to prevent a miscarriage of justice' [or] the question of guilt 'is so doubtful that it would shock the conscience to permit the conviction to stand.' " *State v. Osborne*, 111 N.M. 654, 662, 808 P.2d 624, 632 (1991) (citations omitted). We apply these principles to Defendant's remaining claims.

## A. Failure to Grant Continuance

{48} On October 17, 1996, Defendant filed a motion to exclude the testimony of the State's fingerprint expert, Ron Smith, or grant a continuance to allow the defense more time to prepare for cross-examination of this witness. Defendant did not pursue this motion before trial, however, and his trial counsel stated at the beginning of his second trial that the defense was ready to proceed. When the State informed the district court that Smith would be called to testify the next day, Defendant's trial counsel indicated that the defense had received Smith's reports and only requested "a short time to interview him." The district court granted this request, and no mention was made of the October 17 motion until after the close of the evidence. Under these circumstances, the issue of whether to exclude or postpone Smith's trial testimony was not preserved for appellate review. *See* Rule 12–216(A); *cf. State v. Mora*, 1997–NMSC–060, ¶¶ 45–46, 124 N.M. 346, 950 P.2d 789 (holding that a Defendant's inaction when presented with an opportunity to cure the State's delay in disclosing witness interviews resulted in a waiver of the Defendant's claim that the delay prevented effective cross-examination of the witness).

{49} Further, the record does not indicate that the district court's decision to allow Smith to testify at trial on October 24, 1996, resulted in fundamental error. We note that Defendant was made aware of the State's effort to obtain further analysis of the palm print on the murder weapon when the State moved for release of the palm print evidence at a hearing on September 4, 1996. The State also provided the defense with Smith's name and phone number in its Sup-

plemental Notice of Intent to Call Witnesses on October 8, 1996. Under these circumstances, we cannot say that the timing of Smith's testimony resulted in " 'a miscarriage of justice' [or made] the question of guilt . . . 'so doubtful that it would shock the conscience to permit the conviction to stand.' " *Osborne*, 111 N.M. at 662, 808 P.2d at 632 (citations omitted).

## B. Admission of Evidence of Defendant's Escape

{50} Prior to his first trial, Defendant moved to have the State identify any of his prior bad acts that the prosecution intended to introduce at trial. The State responded that the only prior bad act at issue was Defendant's escape from prison while on furlough at the basketball game on the night of the murder. Defendant discussed the inadmissibility of several prior bad acts with the district court on the eve of the first trial, but did not pursue a ruling on the escape evidence after the district court stated that: "I don't think I need to rule on things that may or may not occur." Defendant did not object at either his first or second trial when his escape was mentioned in the prosecutor's opening statements and in the testimony of several witnesses. Indeed, Defendant's trial counsel even discussed Defendant's escape with the jury during voir dire in the second trial. Under these circumstances, the issue of the admissibility of evidence concerning Defendant's escape was not preserved for appellate review. *See* Rules 12–213(A)(4), 12–216(A); *cf. State v. Lopez*, 105 N.M. 538, 544, 734 P.2d 778, 784 (Ct.App.1986) ("To preserve a claim of error for appellate review involving the admissibility of evidence, a party must make a timely objection.").

{51} Further, we cannot say that the State's use of the escape evidence affected Defendant's substantial rights or was so unjust as to create grave doubts about the validity of the verdict. *See State v. Begay*, 1998–NMSC–029, ¶¶ 21–23, 125 N.M. 541, 964 P.2d 102 (discussing limits on appellate review of unpreserved evidentiary issues); *Contreras*, 120 N.M. at 492, 903 P.2d at 234 (same). Although we acknowledge the injustice of admitting "evidence of other bad acts

merely to show the bad character of the accused[,]" *State v. Elinski*, 1997–NMCA–117, ¶ 13, 124 N.M. 261, 948 P.2d 1209, it remains within a trial court's discretion to admit evidence of a Defendant's prior acts under Rule 11–404(B) when the State shows that such evidence is relevant to a material issue such as motive or opportunity. *See generally State v. Williams*, 117 N.M. 551, 557, 874 P.2d 12, 18 (1994). In this case, Defendant's escape was part of the sequence of events leading to the kidnapping and murder of the victim, the unlawful taking of her vehicle, and the crime of resisting, evading, or obstructing a police officer. As part of this sequence, the evidence of Defendant's escape is relevant to the State's theories that Defendant had the opportunity to commit these other crimes, and that his motive for committing the other crimes was to facilitate his escape. The record does not show that the escape evidence was used for an improper purpose, and we will not apply the doctrines of fundamental or plain error here.

## C. Failure to Poll Jury Before Declaring Mistrial

{52} Defendant's next contention is that the Double Jeopardy Clause requires reversal of his felony murder conviction because the jury may have impliedly acquitted him of this offense in his first trial. Defendant's claim of implied acquittal is based on his assertion that the district court violated Rule 5–611 NMRA 1998 by not polling the jury on lesser included offenses before declaring a mistrial. *Cf. State v. Castrillo*, 90 N.M. 608, 612, 566 P.2d 1146, 1150 (1977) (recognizing that acquittal or conviction of a lesser included offense bars retrial on the greater offense), *overruled on other grounds by State v. Wardlow*, 95 N.M. 585, 624 P.2d 527 (1981). Defendant's claim to a jury poll under Rule 5–611 is based on his contention that the district court erred in failing to instruct the jury that second degree murder and unlawful taking of a vehicle are lesser included offenses of first degree felony murder. *Cf.* UJI 14–250 NMRA 1998 (jury procedure for various degrees of homicide); UJI 14–6002 NMRA 1998 (instruction for necessarily included offense); UJI 14–6012 NMRA

1998 (multiple verdict forms for lesser included offenses).

{53} Under Rule 5–611(D),

[i]f the jury has been instructed on one or more lesser included offenses, and the jury cannot unanimously agree upon any of the offenses submitted, the court shall poll the jury by inquiring as to each degree of the offense upon which the jury has been instructed beginning with the highest degree and, in descending order, inquiring as to each lesser degree until the court has determined at what level of the offense the jury has disagreed.

This rule does not apply here, however, because the jury was not instructed on one or more lesser included offenses. *See O'Kelly v. State*, 94 N.M. 74, 75, 607 P.2d 612, 613 (1980); *cf. State v. O'Kelley*, 113 N.M. 25, 29, 822 P.2d 122, 126 (Ct.App.1991) ("Only where the jury is given the full opportunity to return a verdict either on the greater or alternatively on the lesser offense does the doctrine of implied acquittal obtain.").

{54} Further, Defendant's trial counsel failed to preserve the alleged instructional error for appellate review because he did not tender any jury instructions at the first trial to indicate that the charges of second degree murder and unlawful taking of a vehicle should be considered as lesser included offenses. To preserve error concerning a "failure to instruct on an issue, a correct written instruction must be tendered before the jury is instructed." Rule 5–608(D) NMRA 1998. While we have recognized an exception to this rule when a court fails to instruct a jury on an essential element of an offense that is factually at issue, *see Osborne*, 111 N.M. at 662–63, 808 P.2d at 632–33, we have declined to apply the doctrine of fundamental error to a defendant's choice of whether to have the jury instructed on lesser included offenses, *see State v. Boeglin*, 105 N.M. 247, 250–52, 731 P.2d 943, 946–48 (1987). "[T]he defendant in a first degree murder prosecution may take his [or her] chances with the jury by waiving instructions on lesser included offenses and cannot be heard to complain on appeal if he [or she] has gambled and lost." *Id.* at 251, 731 P.2d at 947.

{55} When the jury is not instructed on lesser included offenses, "[t]he protection ... against double jeopardy may reasonably and rationally be safeguarded by the trial judge exercising sound discretion in determining from the situation before him [or her] that the jury is hopelessly deadlocked." *O'Kelly,* 94 N.M. at 75, 607 P.2d at 613. Unlike the record in *Castrillo,* 90 N.M. at 613, 566 P.2d at 1151, the record of Defendant's first trial contains no ambiguity in the jurors' statements that they could not reach a verdict on any of the charges. During deliberations, the jury foreman wrote a note to the district court stating that "the jury is deadlocked on all counts." Before declaring a mistrial, however, the district court advised the jury to consider each charge separately and made further inquiries as to whether the jurors were truly deadlocked. The jury's responses to these inquiries made clear that they had deadlocked on all counts and had not unanimously voted to acquit or convict Defendant on any of the charges at issue. Thus, the mistrial did not provide a basis for dismissal of the felony murder charge, and the district court did not err in denying Defendant's motion to dismiss this charge prior to his second trial.

### D. Violation of Six–Month Rule

{56} On October 17, 1996, Defendant filed a motion to dismiss the charges against him on the grounds that his second trial did not occur within six months after the district court filed its order declaring a mistrial on March 27, 1996. *See* Rule 5–604(B)(3), (D). Because the State filed a nolle prosequi and then re-indicted Defendant with additional charges, however, the six-month time limit for Defendant's second trial did not begin to run until after he was arraigned on the second indictment on April 26, 1996. *See* Rule 5–604(B)(1); *cf. State v. Bolton,* 1997–NMCA–007, ¶ 1, 122 N.M. 831, 932 P.2d 1075 ("Ordinarily, prosecutors may file nolle prosequis and subsequently file new charges based on the same incident at will."). Defendant was retried within six months of his arraignment on the second indictment, as required by Rule 5–604(B)(1). Therefore, the six-month rule does not provide a basis for reversal of Defendant's convictions.

{57} In his Rule 5–604 motion, Defendant made no showing that the State dismissed and refiled the charges in order to circumvent the six-month time limit or for any other bad reason. *Cf. Bolton,* 1997–NMCA–007, ¶ 2, 122 N.M. 831, 932 P.2d 1075 (noting that "trial courts may and should interfere with prosecutorial discretion when prosecutors have bad reasons for their actions"). While Defendant alleged prosecutorial vindictiveness in a separate motion to dismiss the aggravated kidnapping and armed robbery charges based on his constitutional rights to due process and a speedy trial, the issues raised in that motion are analytically distinct from the Rule 5–604 inquiry. *See id.* ¶ 11; *cf. State v. Eskridge,* 1997–NMCA–106, ¶ 2, 124 N.M. 227, 947 P.2d 502 (distinguishing analysis under six-month rule from analysis of constitutional speedy-trial issue). Therefore, the issue of whether the State dismissed and refiled the charges in order to circumvent the six-month rule was not preserved for appellate review. *See generally* Rule 12–216(A).

{58} Further, the record does not show that any delay caused by the State's nolle prosequi resulted in fundamental error. Defendant requested and received at least three extensions of time from this Court under Rule 5–604(C) before he filed his motion accusing the State of unlawful delay under Rule 5–604(D), and Defendant's motion was filed only four days before his second trial began. In contrast, the State's nolle prosequi was filed only three weeks after the district court's order declaring a mistrial and well before the court had set a date for Defendant's second trial. Thus, unlike *Bolton,* 1997–NMCA–007, ¶ 14, 122 N.M. 831, 932 P.2d 1075, there is no showing that the State filed its nolle prosequi on the eve of Defendant's trial or under other circumstances suggesting a bad reason. We decline to apply the doctrine of fundamental error here.

## V. CUMULATIVE ERROR

{59} Defendant's final contention is that the district court made numerous errors, which had the cumulative effect of depriving

him of a fair trial. *See State v. Baca*, 120 N.M. 383, 392, 902 P.2d 65, 74 (1995). We conclude from our review of the record, however, that any errors made by the district court were too slight to have the cumulative effect of depriving Defendant of a fair trial. *See State v. Woodward*, 121 N.M. 1, 12, 908 P.2d 231, 242 (1995). Therefore, the doctrine of cumulative error does not provide a basis for reversal of Defendant's convictions.

## VI. CONCLUSION

{60} For the foregoing reasons, we reverse Defendant's convictions for second degree murder and armed robbery on the ground that they violate his constitutional right to be free from double jeopardy. Finding no merit in Defendant's remaining contentions, we affirm his convictions for first degree felony murder, aggravated kidnapping, unlawful taking of a vehicle, and resisting, evading, or obstructing an officer. We remand to the district court for resentencing consistent with this opinion.

{61}  **IT IS SO ORDERED.**

BACA, FRANCHINI, SERNA and MAES, JJ., concur.

1999-NMCA-019