The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: March 27, 2025

**NO. S-1-SC-39517**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**CRISTAL CARDENAS,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
Conrad F. Perea, District Judge

Bennett J. Baur, Chief Public Defender
Caitlin C.M. Smith, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Serena R. Wheaton, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**VIGIL, Justice.**

{1}     Defendant Cristal Cardenas appeals directly to this Court from her convictions of first-degree murder, NMSA 1978, § 30-2-1(A)(1) (1994), conspiracy to commit first-degree murder, NMSA 1978, § 30-28-2 (1979), and criminal solicitation to commit first-degree murder, NMSA 1978, § 30-28-3 (1979). Defendant presents four arguments: (1) a series of evidentiary rulings resulted in reversible cumulative error, (2) the State presented insufficient evidence to convict Defendant of first-degree murder, (3) the convictions for conspiracy and criminal solicitation constitute double jeopardy, and (4) the district judge violated her constitutional right to a public trial.

{2}     We reverse Defendant's convictions based on a single evidentiary ruling. We conclude that the district court abused its discretion and committed reversible error when it allowed the State to question Defendant about her six-month-old child's positive methamphetamine test. We reject Defendant's sufficiency of the evidence and double jeopardy arguments and, therefore, remand for a new trial on all charges for which the jury convicted Defendant. Finally, we emphasize that the First Amendment to the United States Constitution provides the general public and the press with the right to access criminal trials. Therefore, although we do not reverse

Defendant's convictions on the basis of this issue, we conclude that the district court erred by seizing the notes of Defendant's trial observer without legal justification.

## I.    BACKGROUND

{3}    In the early morning hours of March 25, 2018, Mario Cabral and Vanessa Mora were shot to death in their home. Mora's thirteen-year-old daughter, S.D., awoke to the sounds of a vehicle. She heard sliding glass doors shattering, footsteps, and gunshots. Struck with fear, S.D. covered herself with her blanket and fell asleep. She was awakened at about 9:00 a.m. by Cabral's and Mora's phones ringing without an answer. Upon entering the living room, she found Cabral and Mora deceased. S.D. ran to her neighbor's home for help, and the neighbor called the police.

{4}    In 2007, Defendant and Cabral had a child together, Y.C., but the couple's relationship ended. In 2015, Defendant filed a petition in family court against Cabral to establish paternity, determine custody and time-sharing, and assess child support. Subsequently, in early November 2016, the family court entered an interim child custody and visitation order limiting Cabral's visitation with Y.C.

{5}    Defendant testified that she was not angry about the family court's decision to allow expanded visitation with Cabral, but the State presented evidence that Defendant hired a hitman to kill Cabral over the custody case. Edward Alonso

testified at trial that, shortly after he got out of prison in January 2018, a friend connected him by phone with Defendant, who asked if he would kill someone for her. For $10,000—half upfront—he agreed.

{6} Alonso testified that he met with Defendant several times and that sometimes Defendant's boyfriend, Luis Flores, was present. Defendant gave him the layout of the property where Cabral lived, the address of the property, a description of the property, and a photo of Cabral. Together, Defendant and Alonso surveilled where Cabral lived. Defendant told Alonso that there was a narrow time frame for the murder because of the custody battle and that if he would not murder Cabral, Flores would do it. At one meeting, Defendant and Flores showed Alonso a .45-caliber gun. Defendant paid Alonso $3,000. Because it was less than the agreed-upon amount, he decided not to murder Cabral.

{7} In mid-February of 2018, Alonso was arrested on the way back from where Cabral lived for having a gun while on probation. He decided to inform the FBI of the plot to kill Cabral. He told the FBI that Cabral would be killed in the following month with a .45-caliber gun and gave them a description of the property where Cabral lived.

{8} Former FBI agent George Dougherty testified about his interactions with Alonso. ) He stated that Alonso offered information about a murder for hire that

Alonso agreed to commit. According to Agent Dougherty, Alonso offered physical descriptions of the persons involved, Defendant's first name, Cabral's first name, and directions to where Cabral lived. Following Alonso's directions, Agent Dougherty was able to locate where Cabral lived, which matched Alonso's description. He learned that Defendant was, in fact, involved in a custody battle with Cabral.

{9} Agent Dougherty concluded that he "couldn't find anything to show that [Alonso] wasn't being 100 percent truthful" and that Alonso's account "had merit." On the basis of Alonso's information, the FBI warned Cabral that there was a threat against his life.

{10} Additional inculpatory evidence presented by the State included photographs from Defendant's phone showing the back of the house where the murders occurred. Although a witness testified that she took pictures of where Cabral lived at Defendant's request to assist in the custody battle, that witness did not recall ever taking pictures of the back of the house. Defendant also had numerous aerial images on one of her phones depicting where the victims lived and the surrounding area.

{11} Further, Cabral's aunt and uncle both testified that Defendant picked up a gun that, according to the aunt, Defendant had previously left with her. Neither the aunt nor uncle was certain about when the gun was picked up, and their accounts differed

4

by several years. The uncle testified that the gun was .45-caliber. Police found .45 caliber ammunition, among other types, in one of the bedrooms in Defendant's house. At the scene of the killings, police found .45 caliber shell casings.

{12} Defendant testified that she never had a gun, did not know Alonso, never paid Alonso any money, never told him that Flores would kill Cabral, and did not want Cabral dead.

{13} The jury acquitted Defendant of the first-degree murder of Mora but convicted her of the first-degree murder of Cabral, conspiracy to commit first-degree murder, and criminal solicitation of first-degree murder.

{14} Additional facts are provided as necessary in the following discussion.

**II. DISCUSSION**

**A. The District Court Erred by Allowing the State to Question Defendant About Her Child's Positive Methamphetamine Test; Because the Error Is Not Harmless, We Reverse Defendant's Convictions**

**1. Cross-examination of Defendant**

{15} Defendant had a child, Y.C., with Cabral. She also had a child, A.F., with Flores, who was approximately six months old at the time of Defendant's arrest.

{16} Defendant testified in her defense. During cross-examination, the State asked Defendant why six-month-old A.F. tested positive for methamphetamine. The exchange was as follows:

5

State:      [Cabral] didn't care as much about [Y.C.] as you did, did he?

Defendant:  I always had [Y.C.] since she was born.

State:      And [A.F.]?

Defendant:  And [A.F.]

State:      Both of those girls, they are your life, right?

Defendant:  Yes, they are.

State:      You would do anything to keep them safe?

. . . .

Defendant:  Like, danger-wise?

State:      Danger-wise, yes.

Defendant:  Well, that's what a parent would keep a child safe.

State:      I agree. So why is it that your child [A.F.] tested positive for meth when y'all got arrested?

Defense counsel objected immediately. In a sidebar, defense counsel explained to the district court that he had not received the required notice that the State intended to use this evidence and that he had not heard until that moment of a child of Defendant testing positive for methamphetamine. He further argued that the methamphetamine test seemed to relate to the actions of Flores, not Defendant, and that the evidence was prejudicial and without probative value.

{17}   The State asserted that Flores pleaded guilty to endangering A.F. The State argued Defendant was

> leaving a misrepresentation on this jury of how great parents they are, how she's the only one who cared for them, that all she ever wanted . . . was these children to be safe and calm and comfortable. And that is a big misrepresentation because if that were the truth, your honor, these children would not be testing positive for methamphetamine.

6

{18} The State further argued that Defendant's testimony on direct examination placed her character at issue. More specifically, the State argued to the district court that Defendant stated that she is "peaceful," "a good mother," and a "law-abiding citizen." In addition, the State argued that Defendant was incorrect in maintaining that notice is required under these facts:

> [Rule 11-]404 [NMRA] goes to notice and character evidence when you are trying to use that in your case in chief, not when if the defendant is going to take the stand and this and that. That goes when you are trying to bring in extraneous offenses in the case in chief for the purposes of there's relevancy; there's modus operandi, whatever it is that you're going to try and prove under that except . . . under the exception to hearsay and under [Rule] 404, etc.

{19} The district court concluded that the State could elicit limited testimony about A.F.'s positive methamphetamine test. Upon return to the courtroom, the State asked Defendant whether A.F. tested positive for methamphetamine, to which she responded, "I believe so."

{20} On redirect examination, Defendant stated that subsequent to A.F.'s positive drug test, Flores was charged on the basis of A.F.'s test. She further testified that she believed that the case against Flores was dismissed by the prosecutor.

**2. Preservation and standard of review**

{21} At trial, Defendant objected and preserved five distinct arguments against the State's questioning regarding A.F.'s positive methamphetamine test. *See State v.*

7

*Clarkson*, 1938-NMSC-012, ¶¶ 6-7, 42 N.M. 289, 76 P.2d 1161 (holding an objection must specify particular reasons for a "review . . . by this [C]ourt" on appeal).

{22} First, in accord with Rules 11-401 NMRA and 11-403 NMRA, Defendant argued that the State's questioning was prejudicial and lacked value probative to this case. *See* Rule 11-401 ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action."); Rule 11-403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). Next, in response to the State's assertion under Rule 11-404(A)(2)(a)[1] that Defendant "put[] her character in on direct," Defendant argued that she did not, in fact, do so. *See* 11-404(A)(2)(a) (stating that if evidence is admitted of a defendant's "pertinent trait, . . . the prosecutor may offer evidence to rebut it"). Finally, Defendant argued that the State's inquiry concerning A.F.'s positive test did not

---

[1]Rule 11-404 NMRA was amended in 2022 and became effective following the trial of this case. The 2022 amendment, which added subparagraph (B)(3), does not affect our substantive analysis. For clarity and ease of reference, we refer to the current version of the rule throughout this opinion.

comply with Rule 11-404(B) due to insufficient notice and that this Rule generally prohibits such character evidence. *See* 11-404(B)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); Rule 11-404(B)(3) (requiring "reasonable notice" to a defendant when the prosecution intends to use "any evidence of crimes, wrongs, or other acts"; the notice must be provided prior to trial unless the court excuses that failure "for good cause").

{23}   The district court then issued an oral ruling as follows: "This is a 11-404 argument, and with that, I'm not looking at propensity itself; I am just looking, in fact, that the door was opened, and we can use this; I am going to allow this question, but I am going to ask that it be, that it be limited."

{24}   Based on the district court's language in its oral ruling, we infer that it considered the arguments made by counsels to be governed by Rule 11-404(A)(2)(a), thus permitting rebuttal character evidence by "opening the door." *See* Christopher B. Mueller and Laird C. Kirkpatrick, 1 *Federal Evidence*, § 4.24 at 703-04 (4th ed. 2013) ("When testimony ranges beyond these basic [background] facts . . . and beyond matters that are directly relevant to the charges or defenses, and paints not only a picture of innocence but a self-portrait of a person whose background, outlook, personality, or philosophy make it unlikely that he committed

9

the crime or had the necessary mental state, then it is fair to view this strategy as an effort to prove good character, thus opening the door to counterattack by the prosecutor.").

{25}	Defendant, on appeal, only argues that the State's inquiry into A.F.'s positive methamphetamine test was improper under Rule 11-404(B). Thus, Defendant may have abandoned her objections under Rules 11-401, -403, and -404(A) despite raising these objections at trial. *See State v. Sandoval*, 1975-NMCA-096, ¶ 11, 88 N.M. 267, 539 P.2d 1029 (concluding that issues not addressed in briefings were deemed abandoned).

{26}	However, this unique preservation and potential abandonment issue can and should be cured by this Court by addressing the Rule 11-404(A)(2)(a) issue sua sponte. *See State v. Goss*, 1991-NMCA-003, ¶ 12, 111 N.M. 530, 807 P.2d 228 ("Where defendants have failed to comply with [briefing rules] . . . , an appellate court *may* decline to address such contention on appeal." (emphasis added)); *State v. Martinez*, 1996-NMCA-109, ¶ 13, 122 N.M. 476, 927 P.2d 31 (stating that the defendant's failure to explain how the issue was preserved in his briefing did not compel the Court of Appeals to disregard the issue); *cf. Doe v. State*, 1975-NMCA-108, ¶ 36, 88 N.M. 347, 540 P.2d 827 (recognizing that an issue of a party's fundamental rights which trial counsel "adequately notified" the district court of, but

did not raise on appeal, could still be reviewed on appeal). Because Defendant articulated the proper objections at trial, fairness tilts in favor of reviewing the Rule 11-404(A) issue as if put adequately before this Court. *Cf. Huckins v. Ritter*, 1983-NMSC-033, ¶ 3, 99 N.M. 560, 661 P.2d 52 ("The transcripts and briefs in this case are sufficient to present the essential question for review on the merits."). We review because the issue was adequately preserved in the district court. Rule 12-321 NMRA ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked.").

{27} "We review the district court's decision to admit or exclude evidence for an abuse of discretion." *State v. Fernandez*, 2023-NMSC-005, ¶ 8, 528 P.3d 621 (internal quotation marks and citation omitted). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Bailey*, 2017-NMSC-001, ¶ 12, 386 P.3d 1007 (internal quotation marks and citation omitted).

{28} As we explain below, the result is the same for analyses under Rules 11-404(A)(2)(a) and -404(B): the district court abused its discretion to admit this inquiry. Because we further conclude that the error was not harmless, we reverse Defendant's convictions.

**3. Analysis**

**a. Inquiry into A.F.'s positive methamphetamine test was inadmissible under Rule 11-404(B)**

{29} Defendant argues that the State did not give the notice required by Rule 11-404(B)(3) and that A.F.'s test was not admissible for any permitted use under Rule 11-404(B)(2). The State counters that the notice was sufficient because Defendant seemed "familiar[] with the issue" based on the discussion with the district court during the sidebar. The State additionally argues "that Defendant opened the door" to the question about the positive methamphetamine test, invoking the doctrine of curative admissibility.

{30} Rule 11-404(B)(1) states, "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, such evidence is admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 11-404(B)(2). Further, Rule 11-404(B)(3)(a) requires that "[i]n a criminal case, the prosecution must provide reasonable notice of the general nature of any evidence of crimes, wrongs, or other acts that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to review it."

{31}     We need not reach Defendant's notice argument because the State has not offered, or even made a serious attempt at presenting, any admissible purpose under Rule 11-404(B) in this Court or the district court. Moreover, the doctrine of curative admissibility argued by the State is inapposite. "Under the doctrine of curative admissibility, a party may introduce inadmissible evidence to counteract the prejudice created by their opponent's earlier introduction of similarly inadmissible evidence." *State v. Gonzales*, 2020-NMCA-022, ¶ 12, 461 P.3d 920; *see also United States v. Nardi*, 633 F.2d 972, 977 (1st Cir. 1980) (stating that the doctrine applies "only when inadmissible evidence has been allowed, when that evidence was prejudicial, and when the proffered testimony would counter that prejudice"); Frederick C. Moss, *The Sweeping-Claims Exception and the Federal Rules of Evidence*, 1982 Duke L.J. 61, 76 (February 1982) ("The doctrine of curative admissibility should be limited, at least conceptually, to cases . . . in which the admission of rebuttal evidence is justified to counteract prejudicial inadmissible evidence introduced by the other side."). The State does not argue that Defendant presented inadmissible evidence. Therefore, the doctrine of curative admissibility cannot justify the prosecutor's inquiry into A.F.'s positive methamphetamine test.

{32}     "[I]t is incumbent upon the proponent of Rule 11-404(B) evidence to . . . cogently inform the court—whether the trial court or a court on appeal—[of] the

13

rationale for admitting the evidence to prove something other than propensity." *State v. Gallegos*, 2007-NMSC-007, ¶ 25, 141 N.M. 185, 152 P.3d 828. Here, the State has made no argument that the inquiry into A.F.'s positive methamphetamine test was admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" or any other purpose that might satisfy Rule 11-404(B)(2).

{33}     In light of the total absence of a permissible use under Rule 11-404(B)(2), we conclude that it was an abuse of discretion to admit the inquiry into A.F.'s positive methamphetamine test under Rule 11-404(B). *See Bailey*, 2017-NMSC-001, ¶ 12 (stating that a district court abuses its discretion when the ruling is "'untenable or not justified by reason'" (citation omitted)).

**b.     Inquiry into A.F.'s positive methamphetamine test was inadmissible under Rule 11-404(A)(2)(a)**

{34}     Under Rule 11-404(A)(2)(a), a criminal defendant "may offer evidence of the defendant's pertinent [character] trait." *See also State v. Martinez*, 2008-NMSC-060, ¶ 29, 145 N.M. 220, 195 P.3d 1232 (stating that "substantive character testimony" may be offered by a defendant to "establish a general character inconsistent with guilt of the crime with which [the defendant] stood charged" (internal quotation marks and citation omitted)). But if a defendant does so, a prosecutor may offer evidence to rebut evidence of the pertinent character trait. *Id.* ¶ 24; *cf. id.* ¶ 33 (stating

14

that by requiring a pertinent trait, Rule 404(A) confirms "that character evidence must relate to a specific relevant trait in order to be admissible" and that "Rule 404 permits evidence of traits only" (internal quotation marks and citation omitted)).

{35} The classic way of offering character evidence involves calling a "defense character witness" who testifies to the defendant's reputation or provides an opinion on a defendant's pertinent trait. *See* Mueller & Kirkpatrick, *supra*, § 4.24 at 698. However, defendant-witnesses can also address their own character by testifying beyond background information and presenting self-portraits as persons whose experience, personality, philosophy, and disposition make it less likely that they committed the crime. *See id*. at 703-04. In such cases, "the defendant personally opens the door to . . . counterattacks" on character, allowing the State to offer evidence to rebut the image the defendant has created. *Id*. The State claims the latter method of introducing character evidence is what happened in this case.

{36} At trial, the State argued that Defendant offered evidence of three character traits: that she is a "law-abiding citizen," "peaceful," and "a good mother." Our review of the record indicates that Defendant did not offer, or attempt to offer, proof of these character traits on direct examination. In other words, there was no such testimony to rebut.

15

{37} Defendant did not testify that she was a law-abiding citizen. The testimony in that broad ambit was that she was not prohibited from exercising her Second Amendment rights and did not have a conviction for a felony, a crime of violence, or domestic violence. Defendant's specific statements do not constitute evidence for her character as a generally law-abiding citizen. *See State v. Bogle*, 376 S.E.2d 745, 751 (N.C. 1989) (stating that evidence of a lack of convictions merely indicates that one has not been convicted of a crime, whereas "law-abiding" addresses a person's character trait of abiding by all laws).

{38} The State similarly overreaches to contend that Defendant testified that she had a character trait of peacefulness. Defendant stated that she was not angry with the judge adjudicating her custody issues and that she "just wanted everything to go right for [her] daughter[, Y.C.]." She stated that she "always encouraged [her daughter, Y.C.,] to have visits with her dad" despite parenting difficulties, that she never had a gun, and that she did not have a conviction for a felony, a crime of violence, or domestic violence. This testimony does not equate to Defendant testifying that she had a peaceful character. Moreover, even if she had, the State's inquiry into A.F.'s positive methamphetamine test would be off-target and inadmissible as a rebuttal.

**{39}** Finally, we conclude that Defendant did not testify that she had the specific character trait of being a good mother. In addition to stating that she wanted everything to go well for her daughter, Y.C., Defendant testified that she planned to transfer ownership of their house to Y.C. and that she put child support payments into a savings account for Y.C. and encouraged Y.C. to have visits with her father, Cabral. This does not amount to a proof or attempted proof of a character trait of being a good mother. And there is no suggestion in this case that Defendant was responsible for A.F.'s exposure to methamphetamine, so we are not persuaded that the inquiry into A.F.'s positive test would be admissible to rebut evidence that she had the character trait of a good mother had there been such evidence.

**{40}** When as in this case the defendant-witness testimony is focused on background information and facts relevant to the charged crime, no "door" is opened to an attack on character. *See* Mueller & Kirkpatrick, *supra*, § 4.24 at 703-04. Only if the defendant-witness "ranges beyond these basic [background and relevant] facts" to "personally" self-identify to a jury as the kind of person who would not engage in the charged crime does the character-evidence "door" open. *Id.* Accordingly, we conclude that it was an abuse of the district court's discretion to allow the inquiry into the evidence under Rule 11-404(A)(2)(a) because Defendant did not personally open the door to evidence of the specific character traits of being

law-abiding, peaceful, or a good mother. *See Bailey*, 2017-NMSC-001, ¶ 12 (stating that a district court abuses its discretion when its ruling is "'untenable or not justified by reason'" (citation omitted)).

### c.     The district court's error was not harmless

{41}     Having concluded that a nonconstitutional error has been committed, it is our responsibility to reverse and remand for a new trial unless there is no reasonable probability that the error affected the jury's verdict. *State v. Tollardo*, 2012-NMSC-008, ¶¶ 25, 36, 275 P.3d 110. To assess the probable effect of evidentiary error, we evaluate the circumstances surrounding the error. *Fernandez*, 2023-NMSC-005, ¶ 24. This evaluation includes, but is not limited to, "the source of the error, the emphasis placed on the error, evidence of the defendant's guilt apart from the error, the importance of the erroneously admitted evidence to the prosecution's case, and whether the erroneously admitted evidence was merely cumulative." *Id.* (internal quotation marks and citation omitted).

{42}     We begin by noting that the issue of A.F.'s drug test arose again during Defendant's closing argument. Defendant stated that the question about the positive drug test was a "punch below the belt," given that it referred to a case brought against Flores, not her. And furthermore, argued Defendant, the case was dismissed.

{43} The State interrupted with an objection: Defendant was "misrepresenting things." The prosecutor asserted that there was no evidence put forth that the case against Flores was dismissed and vehemently asserted that the case was not, in fact, dismissed. The district court sustained the State's objection and instructed the jury to disregard the discussion related to the charges against Flores.

{44} During her closing statement, Defendant attempted to mitigate the prejudice from the inquiry but was improperly thwarted by the State. Defendant sought to highlight that the child endangerment case against Flores was dismissed. But the State objected and argued to the district court that there was no evidence presented that the case against Flores was dismissed. This was false: Defendant testified that she thought the case was dismissed. The prosecutor further stated unequivocally that the case was not dismissed. This, too, was a false statement: as the State concedes on appeal, the case was, in fact, dismissed. And, boldly, the prosecutor accused Defendant's attorney of "misrepresenting things." All of these false statements were made in front of the jury and quickly reinforced by the district court in its sustaining of the State's objection. Under these circumstances, we are unconvinced by the State's contention that the error was harmless.

{45} Moreover, the harmless error argument offered by the State is weak. The State argues that it only "asked one question to rebut the image Defendant had painted of

herself" and that the "question did not go the heart of the State's case or Defendant's defense." Essentially, the State argues that the inquiry into A.F.'s positive methamphetamine test was not very important or impactful. And yet the State made multiple misstatements to the district court that, cumulatively, had the effect of keeping this question in front of the jury and adding to the question's impact.

{46} Defendant makes a more compelling argument that the error was not harmless. Defendant states that Defendant's credibility was an important aspect of the case. The evidence, although sufficient to support Defendant's convictions, was largely circumstantial. Defendant contends that the State's inquiry into A.F.'s positive methamphetamine test portrayed her in a negative light, suggesting to the jury that she might have criminal ties and might be capable of hiring a hitman or committing murder. Moreover, the prosecutor's false statements during closing— which were implicitly endorsed by the district court's ruling to disregard Defendant's discussion of Flores's case—unfairly undermined her credibility by implying to the jury that she and her lawyer were untrustworthy.

{47} We conclude there is a reasonable probability that the error affected the jury's verdict. *See Tollardo*, 2012-NMSC-008, ¶ 36 (stating that our harmless error review of nonconstitutional error examines whether there was a reasonable probability that the error affected the verdict). In this case, the State was the source of the error; the

20

evidence of Defendant's guilt, although substantial, was circumstantial; the error affected an important issue in the case—credibility; the State, although it disavows the importance of the evidence at issue, went to great lengths to preserve its impact; and, finally, the evidence at issue was not cumulative. *See Fernandez*, 2023-NMSC-005, ¶ 24 (instructing appellate courts to examine "the source of the error, the emphasis placed on the error, evidence of the defendant's guilt apart from the error, the importance of the erroneously admitted evidence to the prosecution's case, and whether the erroneously admitted evidence was merely cumulative" (internal quotation marks and citation omitted)). Accordingly, we reverse Defendant's convictions and remand for a new trial.

**B.  Defendant's Convictions of Criminal Conspiracy and Criminal Solicitation Do Not Violate Double Jeopardy Protections**

{48}   "A double jeopardy challenge is a constitutional question of law which we review de novo." *State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747.

{49}   Defendant argues that her convictions of conspiracy to commit first-degree murder and criminal solicitation of first-degree murder violate double jeopardy protections afforded by the Fifth Amendment to the United States Constitution. When we conclude that there was a double jeopardy violation, we "vacate the conviction carrying the shorter sentence." *State v. Montoya*, 2013-NMSC-020, ¶ 55, 306 P.3d 426.

21

{50} "Double jeopardy protects against multiple punishments for the same offense." *State v. Silvas*, 2015-NMSC-006, ¶ 8, 343 P.3d 616. "Cases involving multiple violations of a single statute are referred to as 'unit-of-prosecution' cases, while cases involving violations of multiple statutes are "double-description" cases. *Id*. This is a double-description case.

{51} To analyze double-description cases, we apply a two-part framework. *Id.* ¶ 9. First, we examine whether the defendant's conduct is unitary. *Id.* If not, there is no double jeopardy violation and our analysis concludes. *Id.*

{52} However, if the conduct at issue is unitary, we examine whether the Legislature intended to punish the offenses separately. *Id.* If we conclude that separate punishments for the offenses are the Legislature's intent, there is no double jeopardy violation. *Id.* Thus, to establish a double jeopardy violation in double-description cases, a defendant must demonstrate that the conduct is unitary and that the Legislature did not intend separate punishments for the offenses at issue. *Id.*

{53} To determine whether conduct is unitary, we examine whether the defendant's acts are "separated by sufficient indicia of distinctness." *State v. Phillips*, 2024-NMSC-009, ¶ 38, 548 P.3d 51 (internal quotation marks and citation omitted). "Conduct is unitary when not sufficiently separated by time or place, and the object

and result or quality and nature of the acts cannot be distinguished." *Silvas*, 2015-NMSC-006, ¶ 10.

{54}   Defendant argues that we must presume that unitary conduct underlies the solicitation and conspiracy convictions pursuant to the *Foster* presumption. *See State v. Foster*, 1999-NMSC-007, ¶ 28, 126 N.M. 646, 974 P.2d 140, *abrogated on other grounds by Kersey v. Hatch*, 2010-NMSC-020, ¶¶ 9, 17, 148 N.M. 381, 237 P.3d 683. Under *Foster*, we presume that conduct is unitary where jury instructions provide alternative bases for conviction of an offense, one of which violates double jeopardy, and where the record fails to disclose which alternative the jury relied on. *State v. Sena*, 2020-NMSC-011, ¶ 47, 470 P.3d 227.

{55}   The solicitation charge, in this case, required the jury to find that Defendant "intended that another person commit first degree murder" and that Defendant "solicited, requested, induced, or employed the other person to commit" the murder. The conspiracy charge required the jury to find that "[D]efendant and another person by words or acts agreed . . . to commit first degree murder" and that "[D]efendant and the other person intended to commit first degree murder." Defendant argues that both relevant jury instructions indicated the same date of offense—"on or about" the date of the murders—and both stated that Defendant acted with "another person" without specifying the other person. Furthermore, the prosecutor said during the

23

closing argument that Defendant conspired with Alonso and Flores. In other words, argues Defendant, the jury could have found Defendant guilty of conspiracy not with Flores but with Alonso, which would have been based on the same conduct by Defendant as for the crime of solicitation. Defendant concluded that "[t]he evidence presented at trial did not establish separate factual bases for conspiracy and solicitation."

{56} We disagree. In this case, the record discloses which alternative the jury relied upon. The solicitation conviction is clearly based on Defendant's request that Alonso murder Cabral for money. The crime was completed at the time of the request; the later payment bolstered the evidence of Defendant's intent that Alonso commit the murder.

{57} We further conclude that Defendant's conspiracy conviction was not grounded in these actions but, instead, in an agreement with Flores. The jury acquitted Defendant of the murder of Mora but convicted her of the murder of Cabral. We can infer that Defendant was convicted of conspiracy with Flores in the killing of Cabral.

{58} The evidence comports with this theory. There was testimony indicating that a conspiracy between Defendant and Flores developed in response to Alonso's delay and ultimate failure to complete the murder for hire. That is, Alonso testified that

Defendant told him that Flores would murder Cabral if Alonso "wasn't able to finish the job." Defendant and Flores also showed Alonso a .45 caliber gun and asked whether he had an extra magazine for it. The structure of the verdict, in combination with the evidence, indicates that the jury found a conspiracy between Defendant and Flores, whereas the solicitation conviction is based on Defendant's request to Alonso. Stated otherwise, the solicitation and conspiracy convictions were based on entirely distinct conduct. Accordingly, we conclude that the *Foster* presumption has been overcome in this case. *See Sena*, 2020-NMSC-011, ¶¶ 52, 56 (concluding that the *Foster* presumption was overcome because "[a]lthough the [jury] instructions permitted the jury to convict" the defendant of multiple crimes under the same instruction's alternatives, the evidence demonstrated that the crimes were separated by sufficient indicia of distinctness); *see also State v. Franco*, 2005-NMSC-013, ¶ 7, 137 N.M. 447, 112 P.3d 1104 ("The proper analytical framework is whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." (internal quotation marks and citation omitted)). We thus conclude that there was no double jeopardy violation in Defendant's convictions of both conspiracy and solicitation. *Silvas*, 2015-NMSC-006, ¶ 9.

**C.  Substantial Evidence Supports Defendant's Conviction of First-Degree Murder**

{59}  Defendant argues that the first-degree murder conviction is not supported by sufficient evidence, which, if true, would bar retrial for that charge. *State v. Consaul*, 2014-NMSC-030, ¶ 41, 332 P.3d 850. The jury was required to find beyond a reasonable doubt that, in relevant part, Defendant killed Cabral and did so with the deliberate intent to take away his life.

{60}  "Our standard of review for sufficiency of the evidence is highly deferential to the jury's verdict." *State v. Chavez*, 2024-NMSC-023, ¶ 40, 562 P.3d 521. The jury's verdict can be supported by "substantial evidence of either a direct or circumstantial nature." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314.

{61}  "We view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Chavez*, 2024-NMSC-023, ¶ 40 (internal quotation marks and citation omitted). We do "not invade the jury's province as fact-finder by second guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting [our] judgment for that of the jury." *Id.* (internal quotation marks and citation omitted). Accordingly, "evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version

26

of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "So long as a rational jury could have found beyond a reasonable doubt the essential facts required for a conviction, we will not upset a jury's conclusions." *Chavez*, 2024-NMSC-023, ¶ 40 (internal quotation marks and citation omitted).

{62}    Alonso identified Defendant as the person with whom he discussed murdering Cabral, testifying that Defendant expressed a desire to have him killed within sixty days. The murder ultimately occurred within that approximate time frame. Cabral's aunt and uncle testified that Defendant obtained a .45-caliber gun from them before the murders and Alonso testified that Defendant and Flores showed him a .45-caliber gun. Police found .45-caliber ammunition in one of the bedrooms in Defendant's home. The murder weapon was a .45-caliber gun. On a phone seized from Defendant's car or home, police found photos of the back of the house where Cabral lived—where the murders took place. Additionally, on a phone seized from Defendant's home, police found numerous aerial images of the property where the murders took place and the surrounding area. Alonso testified that Defendant told him that if he was not able to murder Cabral, her boyfriend "was gonna take care of it."

{63}    Defendant argues that because the evidence from the crime scene was, as she characterizes it, exculpatory of both herself and Flores, the *foregoing* nominally

circumstantial evidence is insufficient. Defendant notes, for example, that footprints found at the scene did not match any shoes belonging to Flores and fingerprints found on shell casings did not match Flores' fingerprints. However, to accept Defendant's argument would invade the province of the jury, which we cannot do. *See Chavez*, 2024-NMSC-023, ¶ 40 (stating that we will not reweigh the evidence or substitute our judgment for that of the jury); *Rojo*, 1999-NMSC-001, ¶ 19 ("[E]vidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts."). Accordingly, we conclude that Defendant's conviction of first-degree murder is supported by sufficient evidence.

**D.      The First Amendment Affords a Right of Access to Criminal Trials to the General Public and the Press**

{64}     On the third day of trial, the district court judge confirmed the State's "understanding" that notetaking by trial observers is generally forbidden. Then, having been alerted by the State that there was a woman taking notes in the back of the courtroom, the judge instructed the woman to surrender her notes. Nothing in the record demonstrates that she interfered with or disrupted the proceedings in any way.

{65}     Defense counsel argued that observers may take notes at a public trial. Defense counsel identified the notetaker as a family friend of Defendant, the sister of a local attorney, and the only guest observer allowed to Defendant during her

COVID-19-era trial. On appeal, Defendant argues that the ban on notetaking was tantamount to an unjustified "partial closure of the courtroom" that "violated her right to public trial," warranting reversal.

{66}     Defendant has the right to a public trial under the Sixth Amendment to the United States Constitution, *Gannett Co. Inc. v. DePasquale*, 443 U.S. 368, 379-80 (1979), and New Mexico has an established test to determine whether a closure violates that right, *State v. Turrietta*, 2013-NMSC-036, ¶ 19, 308 P.3d 964. But, because we have already granted Defendant a new trial, we decline to reach her argument on this issue.

{67}     Defendant, however, is not the only party with a constitutional interest in the public nature of a criminal trial. "[T]he press and general public have a constitutional right" to access criminal trials. *Globe Newspaper Co. v. Superior Ct. for Cnty. of Norfolk*, 457 U.S. 596, 603 (1982). The right to access criminal trials "is embodied in the First Amendment." *Id.* We are compelled to discuss this issue based on the actions of the district court judge.

{68}     The First Amendment to the United States Constitution, of course, protects freedom of expression. But not just that. The First Amendment "has a *structural* role to play in securing and fostering our republican system of self-government". *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587 (1980) (Brennan, J.,

29

concurring in judgment) (emphasis in original). This structural role reflects "not only the principle that debate on public issues should be uninhibited, robust, and wide-open but also the antecedent assumption that valuable public debate . . . must be informed." *Id*. (internal quotation marks and citation omitted); *see also Globe Newspaper*, 457 U.S. at 603 ("[T]he First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government.").

{69} The constitutional guarantee of open trials has two important functions. "Open trials . . . assure the criminal defendant a fair and accurate adjudication." *Richmond Newspapers*, 448 U.S. at 593 (Brennan, J., concurring in judgment). But in addition, and importantly, open trials "serve[] other, broadly political, interests" by allowing the public to keep watch over the justice system itself. *See id.* at 594, 596 (Brennan, J., concurring in judgment). "[J]udges bear responsibility for the vitally important task of construing and securing constitutional rights." *Id.* at 595 (Brennan, J., concurring in judgment). And "court rulings impose official and practical consequences upon members of society at large." *Id.* (Brennan, J., concurring in judgment) "Under our system, judges are not mere umpires, but, in their own sphere, lawmakers—a coordinate branch of government." *Id.* at 595-96 (Brennan, J., concurring in judgment). The trial—as a "genuine governmental

30

proceeding"—"plays a pivotal role in the entire judicial process, and, by extension, in our form of government." *Id.* at 595-96 (Brennan, J., concurring in judgment).

{70} "It follows that the conduct of the trial is pre-eminently a matter of public interest." *Id.* at 596 (Brennan, J., concurring in judgment). And open trials are "akin in purpose to the other checks and balances that infuse our system of government." *Id.* (Brennan, J., concurring in judgment); *see also In re Oliver*, 333 U.S. 257, 270 (1948) ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power."). "'Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account.'" *In re Oliver*, 333 U.S. at 271 (quoting 1 Jeremy Bentham, *Rationale of Judicial Evidence* 524 (1827)). "Open trials assure the public that . . . justice is afforded equally." *Richmond Newspapers*, 448 U.S. at 595 (Brennan, J., concurring in judgment); *see also Globe Newspaper*, 457 U.S. at 606 ("[P]ublic access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process.").

{71} Secrecy, on the other hand, "is profoundly inimical to" to demonstrating "the fairness of the law to our citizens." *Richmond Newspapers*, 488 U.S. at 594-95 (Brennan, J., concurring in judgment). "Closed trials breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law." *Id.* at 595 (Brennan, J.,

31

concurring in judgment). And closed trials are deeply contrary to historical practice: the United States Supreme Court was unable to find a single instance of an in camera criminal trial in any federal, state, or municipal court in our country's entire history. *See Globe Newspaper Co.*, 457 U.S. at 605.

{72}    In sum, "a right of access to *criminal trials* . . . is properly afforded protection by the First Amendment." *Id.* at 605-06 (emphasis in original). "Where . . . the [s]tate attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Id.* at 606-07. In this case, the district court wrongly construed notetaking by a member of the public as a problematic rather than protected activity, compelling us to issue this reproach. Prohibiting handwritten notes during court sessions restricts the public's and press's rights of access, distancing the judicial process from public scrutiny and weakening the opportunity for informed discussions on judicial matters. *See Craig v. Harney*, 331 U.S. 367, 374 (1947) ("There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it.").

## III. CONCLUSION

{73}    For the reasons stated, we reverse Defendant's convictions and remand for a new trial.

{74}    **IT IS SO ORDERED.**

_____

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

_____

**C. SHANNON BACON, Justice**

_____

**JULIE J. VARGAS, Justice**

_____

**BRIANA H. ZAMORA, Justice**

**DAVID K. THOMSON, Chief Justice, dissenting**

**THOMSON, Chief Justice (dissenting).**

{75}     The majority bases its decision to order a new trial on what it calls cumulative error, a result of the trial court's admission of one piece of testimony regarding Defendant's infant child, A.F., testing positive for methamphetamine and the State's objection when Defendant raised the issue a second time in closing argument. *Maj. op.* ¶¶ 1-2, 42-45. I disagree that admitting the evidence was an abuse of discretion and would hold that it was proper rebuttal evidence under Rule 11-404(A)(2)(a) NMRA in light of Defendant's testimony. Even if admitting the testimony was error, it was neither cumulative nor reversible. For these reasons, I respectfully dissent.

## IV.     THE TRIAL COURT DID NOT ABUSE ITS DISCRETION

{76}     The trial court's conclusion that Defendant opened the door to the State's question regarding the positive methamphetamine test makes it apparent that the court admitted the testimony as rebuttal evidence under Rule 11-404(A)(2)(a). We review the trial court's decision to admit the testimony under that rule for an abuse of discretion. *State v. Sena*, 2008-NMSC-053, ¶ 12, 144 N.M. 821, 192 P.3d 1198. An abuse of discretion "occurs when the court's ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion . . . unless we can characterize [its ruling] as clearly untenable or not justified by reason." *Id.* (internal quotation marks and citation omitted).

34

{77} The defense repeatedly elicited testimony from Defendant surrounding her children, her demeanor as a parent, and her care for her children. As the majority notes, Defendant testified that she was not angry about the judge's ruling in the custody dispute because she wanted what was right for her daughter, Y.C., that she encouraged her daughter to see Cabral even though the child was reluctant, and that she "had to put [Y.C.] in counseling." She testified that she was sad to hear of Cabral's death because "that was [Y.C.]'s father." While Defendant may not have outright stated "I am a good mother," that is not required. Rule 11-404(A)(2)(a) does not require that the prosecution be confronted with *proof* of a trait as the majority suggests, only that the defense offer evidence of the character trait to open the door to rebuttal. *See* Rule 11-404(A)(2)(a) ("[A] defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it."); *State v. Moultrie*, 1954-NMSC-056, ¶ 7, 58 N.M. 486 , 272 P.2d 686 ("'The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him.'" (quoting *Michelson v. United States*, 335 U.S. 469, 479 (1948))). The trial court, having heard the testimony, concluded that Defendant presented testimony seeking to portray herself as a good parent, something otherwise irrelevant. With that, Defendant

expanded the scope of relevant evidence in the case, opening the door to rebuttal evidence on her otherwise irrelevant character as a parent. *See Coates v. Wal-Mart Stores, Inc.*, 1999-NMSC-013, ¶ 38, 127 N.M. 47, 976 P.2d 999 (reasoning that a party opens the door to the admission of rebuttal evidence when it makes a statement that causes the evidence to become "relevant to rebut[tal]"). Given Defendant's statements, the trial court's decision to admit testimony on Defendant's child testing positive for methamphetamines as rebuttal evidence cannot be characterized as "clearly untenable or not justified by reason," and this Court should defer to the trial court's conclusion. *Sena*, 2008-NMSC-053, ¶ 12 (internal quotation marks and citation omitted).

{78}  The majority asserts, however, that because Defendant's boyfriend, Luis Flores, was charged with child endangerment and not Defendant herself, the positive test cannot be relevant to Defendant's character as a parent. *Maj. op.* ¶¶ 16, 39. I disagree. Defendant need not be charged with child endangerment in order for the jury to reasonably infer a level of responsibility for her child testing positive for methamphetamine. The young child tested positive after living in the home that Defendant shared with Flores. There is no dispute that the child was in her care and that Defendant was responsible for her well-being. The majority provides no reasoning for limiting the jury's ability to infer that Defendant knew there was meth

36

in the home and that her child might be exposed, and there is no basis for questioning such an inference. The positive methamphetamine test was relevant and appropriate rebuttal evidence given Defendant's portrayal of her character as a parent, and the trial court did not abuse its discretion in admitting the testimony under Rule 11-404(A)(2).

## V.    THERE WAS NO REVERSIBLE ERROR

{79}    Even if the trial court abused its discretion in admitting the testimony regarding the positive methamphetamine test, there is no reasonable probability of that evidence inducing the guilty verdict given "all of the circumstances surrounding" the testimony. *State v. Fernandez*, 2023-NMSC-005, ¶ 24, 528 P.3d 621 (internal quotation marks and citation omitted); *State v. Bailey*, 2015-NMCA-102, 357 P.3d 423, ¶¶ 29-30 (holding that admitting testimony is not error if there is no reasonable probability that the testimony affected the verdict), *aff'd*, 2017-NMSC-001, ¶ 29, 386 P.3d 1007.

{80}    The majority frames the evidence in this case as circumstantial, with Defendant's credibility as key. *See maj. op.* ¶¶ 46-47. However, the "evidence of the defendant's guilt apart from the" testimony was substantial. *Fernandez*, 2023-NMSC-005, ¶ 24 (internal quotation marks and citation omitted). The jury heard testimony from Edward Alonso, the man whom Defendant allegedly hired to kill

Victim Cabral mere weeks before Victim Cabral was found dead. Alonso described his conversations with Defendant and the plot in detail, recounted meeting with Defendant multiple times so Defendant could lead Alonso to Cabral, and identified Defendant for the jury as the woman who hired him. Alonso testified that Defendant pressured him to kill Cabral and told him that her boyfriend "Luis was going to take care of it" if Alonso did not kill Cabral.

{81} The jury also heard from George Dougherty, the federal agent who interviewed Alonso regarding what Alonso described as "a murder for hire" scheme stemming out of a custody dispute. Agent Dougherty testified that Alonso told him the first names of the parties involved, including the woman who hired Alonso, "Cristal," which is Defendant's first name, and "Mario," which is Cabral's first name. Alonso testified that he told Agent Dougherty the place and time frame for the killing and that Cabral would be killed with a .45 caliber gun, which was the caliber ultimately used. Additionally, Agent Dougherty was able to corroborate the existence of a custody battle between Defendant and Cabral and identified police reports indicating conflict between the two. Using the detailed information Alonso provided, Agent Dougherty was able to identify Defendant as the likely individual who hired Alonso and to locate and warn Cabral that his life was in danger. In terms of physical evidence, police found .45 caliber ammunition in Defendant's home and

dozens of photos of the house Cabral occupied, obtained from a cell phone located in a car seized from Defendant.

{82}    To overcome the evidence and reach reversible error, the majority portrays the State's reliance on the positive methamphetamine test as pervasive and rooted in egregious prosecutorial behavior. *Maj. op.* ¶¶ 44-47. However, in doing so, the majority diminishes Defendant's own actions centering the evidence as well as our caselaw governing reversible error and closing argument.

{83}    The State's invocation of the methamphetamine test was limited to one question asked of Defendant on cross-examination. It was Defendant who raised the issue for a second time on redirect examination and chose to rehash it again in closing argument. And while the State objected in closing argument and ultimately misstated the disposition of the case against Flores, it was not the State's actions that had the effect of "keeping this question in front of the jury and add[ing] to the question's impact." *Maj. op.* ¶¶ 44-45. Ultimately, the State's actions simply do not satisfy the requirements of reversible error; the State did not emphasize the information, and it was not central or necessary to the State's case while the other evidence of Defendant's guilt was overwhelming. *See Fernandez*, 2023-NMSC-005, ¶ 24.

{84} Seemingly aware of this, the majority frames the State's statements in closing as egregious and unduly harmful to Defendant's credibility in order to support a finding of error. *Maj. op.* ¶¶ 44-47. But damage to Defendant's credibility is not enough, nor are statements in closing argument evidence. UJI 14-104 NMRA. To determine whether the State's erroneous statements during closing argument support reversal, we assess "(1) whether the statement invades some distinct constitutional protection; (2) whether the statement is isolated and brief, or repeated and pervasive; and (3) whether the statement is invited by the defense." *See State v. Sosa*, 2009-NMSC-056, ¶ 26, 147 N.M. 351, 223 P.3d 348. "In applying these factors, the statements must be evaluated objectively in the context of the prosecutor's broader argument and the trial as a whole." *Id*.

{85} Here, the statements did not violate any constitutional protection, and they were completely isolated. Most importantly, the statements were *invited by the defense. Id.* ¶ 33 ("[W]e are least likely to find error where the defense has 'opened the door' to the prosecutor's comments by its own argument or reference to facts not in evidence."). There is also no reason to believe the State was deliberately misleading the court and jury, but rather it appears that the State was confused and acting out of perceived need to correct the record. Those actions simply do not

40

support reversible error justifying a new trial, particularly given the totality of the trial where "evidence of guilt is overwhelming." *Id*. ¶ 34.

{86}     Accordingly, I would affirm Defendant's convictions.

 

 

                                                      _____

**DAVID K. THOMSON, Chief Justice**